UNITED STATES of America,
Plaintiff–Appellee,

v.

Jimmy Gene KELLY, Jr.,
Defendant–Appellant.

No. 92–5045.

United States Court of Appeals,
Tenth Circuit.

Aug. 13, 1993.

**1138**

Thomas S. Woodward, Asst. U.S. Atty. (Tony M. Graham, U.S. Atty., with him on the brief), Tulsa, OK, for plaintiff-appellee.

Robert R. Nigh, Jr., Asst. Federal Public Defender (Stephen J. Greubel, Asst. Federal Public Defender, on the brief), Tulsa, OK, for defendant-appellant.

Before BALDOCK and BRORBY, Circuit Judges, and VRATIL,* District Judge.

BRORBY, Circuit Judge.

Appellant, Jimmy Gene Kelly, appeals his sentence of 360 months for the conviction of second degree murder under 18 U.S.C. § 1111. Appellant contends the sentencing court improperly departed upward from the applicable guideline range in imposing the sentence.

## BACKGROUND

Mr. Kelly, who is part Cherokee Indian, committed the murder on a Quapaw Indian allotment, thus bringing the crime within federal jurisdiction. 18 U.S.C. § 1153 and § 3242. Since Mr. Kelly admitted responsibility for the killing, the only issue before the jury was whether the murder was premeditated. The jury found no premeditation and convicted Mr. Kelly of second degree murder. Under the Sentencing Guidelines, Mr. Kelly was classified in criminal history category II and received a base offense level of 33, yielding a guideline range of 151–188 months. Instead, the sentencing court upwardly departed to an offense level of 41, producing a Guideline range of 360 months to life, from which Mr. Kelly received the 360 month minimum. In upwardly departing, the district court listed four potential aggravating circumstances regarding Mr. Kelly's crime that were not adequately considered by the Sentencing Commission in formulating the offense level for second degree murder: (1) the use of a dangerous instrumentality; (2) the restraint of the victim; (3) extreme conduct; and (4) premeditation. Appellant challenges each of these grounds for departure under 18 U.S.C. § 3742(a)(3).

## FACTS

Mr. Kelly's animosity toward the victim, Vernon Moyer, steadily grew in the period immediately preceding the murder. Apparently, Mr. Kelly was upset about rumors Mr. Moyer was spreading about his family. Mr. Moyer allegedly claimed to have fathered children with Mr. Kelly's sister, and insinuated that Mr. Kelly and his father were dealing drugs. On the morning of the murder, Mr. Kelly learned the police were looking for the son of his friends, and became angry when

---

* The Honorable Kathryn H. Vratil, United States District Judge for the District of Kansas, sitting by designation.

he perceived Mr. Moyer was responsible for revealing the son's whereabouts. There was additional testimony that Mr. Kelly admitted to a friend, eight days prior to the murder, that he intended to kill Mr. Moyer.

On the day of the murder Mr. Kelly visited Mr. Moyer's residence and invited him to go fishing. Mr. Kelly had no intention of fishing as he did not bring a fishing rod on the excursion. Shortly after arriving at the fishing pond, Mr. Kelly grabbed the victim by the throat, slammed him to the ground, and proceeded to choke him. After a few minutes of attempting to remove his assailant's grip, Mr. Moyer's struggle ended as his body went limp in an unconscious state. As Mr. Kelly stood up and walked back over to the pickup truck, the victim apparently gasped for breath. Mr. Kelly removed a jack handle/tire iron implement from the back of the truck and violently inflicted numerous blows to the victim's head, causing severe facial fractures. Still in a rage, Mr. Kelly returned again to the truck and this time chose the jack itself as a weapon. Mr. Kelly, swinging the jack like an ax, decimated the victim's neck, larynx, and voice box. Mr. Kelly then disposed of the body in a nearby pond. A few days after the murder, Mr. Kelly confessed his deed to a co-worker and lamented that he did not punch holes in the victim's body and remove his tennis shoes so the body would not float.

## REVIEW OF DEPARTURES

■ The appellate disposition of an appealed sentence is governed by 18 U.S.C. § 3742(f). In accordance with § 3742(f), the Supreme Court has adopted a two-part departure analysis which examines whether the sentence was imposed in violation of law, and whether the sentence imposed is reasonable. *Williams v. United States,* —— U.S. ——, ——, 112 S.Ct. 1112, 1120, 117 L.Ed.2d 341 (1992). Prior to *Williams,* the Tenth Circuit established a three-step process to review upward departures: 1) de novo review of whether the circumstances cited by the district court warrant departure; 2) clearly erroneous review of the factual determinations underlying the decision to depart; and 3) reasonableness review of the degree of departure. *United States v. White,* 893 F.2d 276, 277–78 (10th Cir.1990). In *United States v. Flinn,* 987 F.2d 1497, 1500 (10th Cir.1993), we held it was still appropriate to engage in the *White* tripartite analysis since it comports with the Supreme Court's approach. Because the district court listed four potential grounds for departure, we will perform the three-step review on each specified ground.

## PREMEDITATION

■ Despite substantial evidence indicating the murder was premeditated, the jury acquitted Mr. Kelly of first-degree murder. In upwardly departing, the district court stated "the record was pretty clear to me as the judge listening to it that premeditation was present." Mr. Kelly contends such an increase violates his constitutional right to due process and protection against double jeopardy. We will not address these constitutional concerns as the issue can be resolved through interpretation of the guidelines.[1] "A

1. The parties present the issue as whether the sentencing court's upward departure based on acquitted conduct is a violation of Mr. Kelly's protection against double jeopardy. The Tenth Circuit allows a sentencing court to consider trial evidence that was applicable to a charge upon which the defendant was acquitted. *United States v. Coleman,* 947 F.2d 1424, 1429 (10th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1590, 118 L.Ed.2d 307 (1992) (relying on U.S.S.G. § 2D1.1(b)(1) for firearms enhancement when he was acquitted of firearms possession). All circuits except the Ninth permit the sentencing court to consider the facts underlying an acquittal in upwardly departing or enhancing a sentence. *See United States v. August,* 984 F.2d 705, 713 (6th Cir.1992), *petition for cert. filed,* (U.S. May 26, 1993) (No. 92–9156); *United States v. Boney,* 977 F.2d 624, 636 (D.C.Cir.1992); *United States v. Olderbak,* 961 F.2d 756, 764–65 (8th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 422, 121 L.Ed.2d 344 (1992); *United States v. Rivera–Lopez,* 928 F.2d 372, 372–73 (11th Cir. 1991); *United States v. Fonner,* 920 F.2d 1330, 1332–33 (7th Cir.1990); *United States v. Rodriguez–Gonzalez,* 899 F.2d 177, 180–82 (2d Cir.), *cert. denied,* 498 U.S. 844, 111 S.Ct. 127, 112 L.Ed.2d 95 (1990); *United States v. Mocciola,* 891 F.2d 13, 16–17 (1st Cir.1989); *United States v. Isom,* 886 F.2d 736, 738–39 (4th Cir.1989); *United States v. Juarez–Ortega,* 866 F.2d 747, 748–49 (5th Cir.1989); *United States v. Ryan,* 866 F.2d 604, 609 (3d Cir.1989). Generally, these courts found no double jeopardy violation be-

fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them." *Lyng v. Northwest Indian Cemetery Protective Ass'n,* 485 U.S. 439, 445, 108 S.Ct. 1319, 1323, 99 L.Ed.2d 534 (1988).

The first prong of the *White* test directs us to examine whether the sentencing court's rationale to depart from the guidelines falls under 18 U.S.C. § 3553(b). Section 3553(b) instructs a court to stay within the applicable guideline range "unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." The relevant section in the guidelines, § 5K2.0, echoes this same language. Thus, the threshold issue is whether the Sentencing Commission adequately considered the element of premeditation when establishing the guideline range for second degree murder.

"In determining whether a circumstance was adequately taken into consideration, the court shall consider only the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission." 18 U.S.C. § 3553(b). In developing the guidelines the Commission examined "the many hundreds of criminal statutes in the United States Code." U.S.S.G. Ch. 1, Pt. A, intro. comment. (n. 5). From these statutes, the Commission developed distinctions between types of criminal conduct and "applied sentencing ranges to each resulting category." *Id.* In formulating the applicable guidelines for first and second degree murder the Commission referenced 18 U.S.C. § 1111(a). *See* U.S.S.G. §§ 2A1.1, 2A1.2. The guidelines incorporate the statutory defi-

nition for first and second degree murder as no separate definitions are provided in the guidelines. Thus, in order to understand the Commission's rationale in·assigning an offense level of 43 for first degree murder and 33 for second degree, we must turn to the statutory definition.

 Under 18 U.S.C. § 1111(a), "[M]urder is the unlawful killing of a human being with malice aforethought." Specifically, first degree murder is "perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing." *Id.* Second degree murder is consequently defined as any murder that does not fall under the definition provided for first degree. *Id.* Premeditation is the only element which distinguishes first degree murder from second.[2] In this case, the parties recognized the sole issue was whether the murder was premeditated.

 The presentence report followed by the district court recommended premeditation as a grounds for upward departure as it is not an element of the offense of conviction. Such an approach is overly simplistic. It is true the "sentencing court should 'treat each guideline as carrying out a "heartland," a set of typical cases embodying the conduct that each guideline describes'." *White,* 893 F.2d at 278 (quoting U.S.S.G. Ch. 1, Pt. A, intro. comment., at 16 (Nov. 1989)) and certainly, a premeditated murder is atypical of the heartland of cases representing second degree murders. Merely examining the elements of the offense of conviction, however, ignores the critical question of whether the Sentencing Commission adequately considered a potential aggravating circumstance in formulating base offense levels. If the sentencing court departs based on a circumstance al-

---

cause the standard of proof at sentencing is preponderance of the evidence, as opposed to the beyond a reasonable doubt standard at trial. In contrast, the Ninth Circuit rejected the consideration of acquitted conduct in upward departures, stating: "[I]t does not follow that the Guidelines permit a court to reconsider facts during sentencing that have been rejected by a jury's not guilty verdict." *United States v. Brady,* 928 F.2d 844, 851 (9th Cir.1991).

**2.** The elements of first degree murder are: "(1) the act or acts of killing a human being; (2) doing such act or acts with malice aforethought; and (3) doing such act or acts with premeditation." *United States v. Free,* 841 F.2d 321, 325 (9th Cir.), *cert. denied,* 486 U.S. 1046, 108 S.Ct. 2042, 100 L.Ed.2d 626 (1988). On the other hand, second degree murder only requires the killing of the victim with malice aforethought. *United States v. Bordeaux,* 980 F.2d 534, 536 (8th Cir.1992).

ready fully considered by the Sentencing Commission, it is an inappropriate grounds for departure. *Williams,* —— U.S. at ——, 112 S.Ct. at 1119. Premeditation was obviously considered in assigning the sentencing ranges applicable to first and second degree murder, as it is the only distinguishing factor between the two crimes, and thus accounts for a ten base offense level disparity. Consequently, the defendant's state of mind was adequately considered by the guidelines when assigning offense levels to the different statutory degrees of homicide.[3] Moreover, premeditation is not a factor which the defendant could possess "of a kind" or "to a degree" not adequately considered by the guidelines, but instead is an all-or-nothing determination. Because the Commission implicitly accounted for the element of premeditation in assigning appropriate offense levels in accordance with the murder statute, it is not a valid ground for departure. Therefore, it is unnecessary to engage in the second and third prongs of the *White* analysis for this justification.

### RESTRAINT OF VICTIM

■ At sentencing, the government referenced U.S.S.G. § 3A1.3 in requesting an adjustment for the restraint of the victim during the commission of the murder. Section 3A1.3 provides a two-level adjustment to the defendant's base offense level, "[i]f a victim was physically restrained in the course of the offense." The sentencing court rejected the government's argument finding that the restraint of the victim in this case might not be "the type of restraint ... Congress has in mind." Despite declining to *adjust* Mr. Kelly's sentence for restraining the victim, the district court found that restraint was an appropriate grounds for *departure*: "[T]here

was restraint of the victim from the standpoint of grabbing him by the throat, so that is a factor that would justify some upward departure."

■ Although the district court never referenced a guidelines section in support of its departure, § 5K2.4 is the only departure section which addresses restraint. Section 5K2.4 (Abduction or Unlawful Restraint) justifies an upward departure "[i]f a person was abducted, taken hostage, or unlawfully restrained to facilitate commission of the offense or to facilitate the escape the scene of the crime, the court may increase the sentence above the authorized guideline range." The type of restraint justifying upward departures under § 5K2.4 is the restraint employed in kidnapping or abducting the victim. There is no evidence in the record showing that Mr. Moyer was taken away from his home against his will. The brief grabbing of the victim's throat in effectuating the murder does not constitute the type of restraint the Commission envisioned in formulating § 5K2.4. Thus, the sentencing court's departure on this ground was inappropriate as a matter of law.

### DANGEROUS INSTRUMENTALITY

■ The court further attempted to justify an upward departure through the defendant's use of the jack and tire iron as dangerous instrumentalities. Specifically, the district court stated:

> There isn't any question in the manner in which the tire iron and the manner in which the bumper jack were used, particularly in using the heavy bumper jack like you would a pickax to violently slam away at the victim's head, it was a dangerous instrumentality, and that's a factor that can be considered.

**3.** Our holding is consistent with the only other case that has addressed an upward departure for a homicide conviction based on the defendant's state of mind. In *United States v. Brady,* 928 F.2d 844 (9th Cir.1991), the defendant was acquitted of first degree murder but convicted of voluntary manslaughter. The sentencing court upwardly departed from the guidelines based in part on the defendant's state of mind. The Ninth Circuit rejected the sentencing court's rationale in upwardly departing. In invalidating the departure, the *Brady* court relied primarily on the

notion that the guidelines do not permit the sentencing court to reconsider facts rejected by a jury's acquittal. *Id.* at 851. Our circuit together with other circuits, has declined to adopt such a broad holding. *See Coleman,* 947 F.2d at 1429, *supra* n. 1. In relevance to this case, however, the *Brady* court more specifically considered the propriety of a departure based on the defendant's state of mind: "[T]he sentencing court's determination of [the defendant's] state of mind is an impermissible factor on which to depart from the Guidelines." *Brady,* 928 F.2d at 852.

We find this justification to be an inappropriate ground for departure since the use of a dangerous instrumentality is usually inherent in the crime of murder.

The guidelines specifically address the use of a dangerous instrumentality as grounds for departure under U.S.S.G. § 5K2.6. Section 5K2.6 reads as follows:

If a weapon or dangerous instrumentality was used or possessed in the commission of the offense the court may increase the sentence above the authorized guideline range. The extent of the increase ordinarily should depend on the dangerousness of the weapon, the manner in which it was used, and the extent to which its use endangered others. The discharge of a firearm might warrant a substantial sentence increase.

The Sentencing Commission in formulating the applicable guideline range for murder contemplated that a dangerous instrumentality would be used in committing the offense. The fact that the end result of a defendant's conduct is murder necessarily implies that the instrumentality effectuating the death of the victim was dangerous in the manner it was used. Therefore, murder must subsume the use of a dangerous instrumentality. *See United States v. Medina–Gutierrez*, 980 F.2d 980, 983 (5th Cir.1992) (§ 5K2.6 was improper basis for departure where defendant was convicted of illegal possession of firearms. Possession of a dangerous instrumentality is only a proper ground for departure when the crime could be committed with or without the instrumentality, not when it is inherent in the charged crime).

The guidelines, in a general statement addressing the propriety of departures, specifically caution, "[w]here, for example, the applicable offense guideline and adjustments do take into consideration a factor listed in this subpart, departure from the applicable guideline range is warranted only if the factor is present to a degree substantially in excess of that which ordinarily is involved in the offense." U.S.S.G. § 5K2.0.

The record does not reflect that Mr. Kelly's use of the tire changing implement fell outside the " 'heartland' or 'set of typical cases embodying the conduct that [the guideline for murder] describes.' " *United States v. Baker*, 914 F.2d 208, 210 (10th Cir.1990) (quoting U.S.S.G. Ch. 1 Pt. A, intro. 4(a) p.s.), *cert. denied*, 498 U.S. 1099, 111 S.Ct. 993, 112 L.Ed.2d 1077 (1991). Thus, defendant's conduct in this case was not to a degree in excess of that which would ordinarily be involved in committing the offense of murder. Therefore, we hold the district court's reliance on § 5K2.6 in upwardly departing was improper.

## EXTREME CONDUCT

We now address the district court's fourth justification for upward departure, § 5K2.8 (Extreme Conduct). The court emphasized this rationale to be its foremost reason for departure: "the principal factor[ ] here that should be considered in the upward departure is under § 5K2.8,[4] which states that an upward departure is warranted if the defendant's conduct was unusually heinous, cruel, brutal, or degrading to the victim. Further, . . . if there is additional gratuitous infliction of injury."

 Mr. Kelly contends § 5K2.8 is unconstitutionally vague on its face and unconstitutional as applied by the district court. We will first address the vagueness claim.[5] Mr. Kelly claims § 5K2.8 is an aggravating circumstance incapable of objective determination and therefore is unconstitutionally vague

---

4. Section 5K2.8 reads in full:
 If the defendant's conduct was unusually heinous, cruel, brutal, or degrading to the victim, the court may increase the sentence above the guideline range to reflect the nature of the conduct. Examples of extreme conduct include torture of a victim, gratuitous infliction of injury, or prolonging of pain or humiliation.

5. Mr. Kelly appears to mischaracterize his own arguments. First, Mr. Kelly constitutionally challenges the vagueness of the section, and second, questions whether the circumstances necessary to justify departure under § 5K2.8 actually exist in the instant case. The second part of Mr. Kelly's challenge is not constitutionally based, but instead challenges whether the district court appropriately applied the section to the facts in this case. We will review this concern in the second prong of the *White* analysis.

as written. We take guidance from Supreme Court capital punishment cases which have previously applied an Eighth Amendment analysis in interpreting the vagueness of words such as "heinous", "cruel," and "brutal."

The Supreme Court in *Maynard v. Cartwright*, 486 U.S. 356, 363–64, 108 S.Ct. 1853, 1859, 100 L.Ed.2d 372 (1988) found the language "especially heinous, atrocious, or cruel," standing alone, provided insufficient guidance to a jury. The *Maynard* court reasoned that without precise explanatory language to guide the sentencing decision, "an ordinary person could honestly believe that every unjustified, intentional taking of human life is 'especially heinous.'" *Id.* at 364, 108 S.Ct. at 1859. In order for such phrases to survive a vagueness challenge, the sentencer's discretion must be channeled "'by clear and objective standards that provide specific and detailed guidance.'" *Creech v. Arave*, 947 F.2d 873, 883, (9th Cir.1991) (quoting *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980)), *cert. denied,* ––– U.S. –––, 113 S.Ct. 1840, 123 L.Ed.2d 466 (1993).

The Supreme Court upheld the constitutionality of the language "especially heinous, cruel, or depraved" as interpreted by the Arizona Supreme Court. *Walton v. Arizona,* 497 U.S. 639, 654–55, 110 S.Ct. 3047, 3057, 111 L.Ed.2d 511 (1990); *see also Lewis v. Jeffers,* 497 U.S. 764, 777–78, 110 S.Ct. 3092, 3100–3101, 111 L.Ed.2d 606 (1990). Such language was deemed constitutional because "the Arizona Supreme Court has sought to give substance to the operative terms." *Walton,* 497 U.S. at 654, 110 S.Ct. at 3057. The Court recognized the proper degree of definition given to such language "is not susceptible to mathematical precision," but the definition must give "meaningful guidance to the sentencer." *Walton,* 497 U.S. at 655, 110 S.Ct. at 1058.

Section 5K2.8 provides that upward departure may be appropriate when "the defendant's conduct was unusually heinous, cruel, brutal, or degrading to the victim". The next sentence in the policy statement provides illustrations of situations which should be considered extreme conduct: "Examples of extreme conduct include torture of a victim, gratuitous infliction of injury, or prolonging of pain or humiliation." The language that attempts to provide guidance to the initial terms must also be reviewed for vagueness. *See Walton,* 497 U.S. at 654, 110 S.Ct. at 3057. The phrases "torture of a victim," "gratuitous infliction of injury," and "prolonging of pain or humiliation," provide objective standards for the application of § 5K2.8. Further, by giving precise detailed illustrations of extreme conduct, § 5K2.8 only applies to specific sets of circumstances. Therefore, we hold § 5K2.8 is not unconstitutionally vague.

■ After upholding the constitutionality of § 5K2.8, we still must engage in the three-part *White* analysis to determine whether the sentencing court's upward departure based on extreme conduct was proper. We begin by reviewing de novo whether the circumstances cited by the district court justify a departure from the guidelines. By using the word "unusually," § 5K2.8 recognizes that departure may be appropriate when the defendant's actions are heinous, cruel, or brutal beyond the characteristics inherently associated with the crime being sentenced. Therefore, we must limit our focus on whether Mr. Kelly's conduct was unusually heinous within the universe of second degree murders, as § 2A1.2 plainly accounts for the heinousness and brutality generally involved in murder. *See United States v. Kikumura,* 918 F.2d 1084, 1118 (3rd Cir.1990). The nature of a defendant's brutal conduct in carrying out a murder was an aggravating circumstance not contemplated by § 2A1.2 in setting an offense level for second degree murder. Thus, the district court properly relied on § 5K2.8 as a justification for departure.

■ In the second prong of the *White* analysis, "we ascertain whether the circumstances cited by the district court to justify departure actually exist in the instant case." *White,* 893 F.2d at 278. Any "findings of fact will be overturned only if they are clearly erroneous." *Id.* The district court made the factual finding that the murder involved "gratuitous infliction of injury," one of the enumerated examples of extreme conduct in § 5K2.8.

The dictionary defines gratuitous as "[u]nnecessary or unwarranted." Webster's II New Riverside University Dictionary (1984). As applied to this case, we interpret the phrase "gratuitous infliction of injury" to include the infliction of an injury beyond what is necessary to effectuate the death of the victim. After strangling the victim to the point of unconsciousness, Mr. Kelly violently inflicted at least six punishing blows to the victim's head and neck area. The doctor performing the autopsy identified the cause of death as "a combination of blunt and sharp force injuries of the head and neck." The doctor further explained the damage to the victim's neck caused by the strike by the jack.

The voice box or larynx was broken and crushed—the cartilages were crushed and broken in several places. The hyoid bone, which is a horseshoe shaped bone that lies just above the voice box between the tongue and the voice box, was broken in several places, and there were multiple small and medium sized arteries and veins that were cut or torn through by this wound.

By strangulating the victim and striking him with a tire iron and a jack, Mr. Kelly inflicted cumulative damage beyond the threshold necessary to kill the victim. Given the repetitive and severe nature of the injuries meted out by the defendant, the district court was not clearly erroneous in its finding of gratuitous infliction of injury.

Under the third prong of *White*, we must now determine whether the district court's imposition of an eight-level departure was reasonable. After articulating its reasons for upward departure, the court then upwardly departed eight levels with no further explanation. We have consistently held that a "district court must specifically articulate reasons for the degree of departure." *Flinn* 987 F.2d at 1502. Merely explaining "why a departure was made does not fulfill the separate requirement of stating the reasons for imposing the particular sentence." *Id.* "[W]e will generally not commence a reasonableness analysis unless the district court has referenced the Guidelines in its

rationale for selecting a degree of departure." *Id.* at 1503.

Moreover, because we rejected three out of the four rationales relied upon by the district court in justifying its departure, we find remand necessary after applying the approach articulated in *Williams*, —— U.S. at —— ——, 112 S.Ct. at 1120–21. Under *Williams*, we are required to "decide whether the district court would have imposed the same sentence had it not relied upon the invalid factor or factors." *Id.* —— U.S. at ——, 112 S.Ct. at 1120. If the sentence was imposed *as a result* of the incorrect application of the guidelines we must remand. *Id.* Although the district court specified that it principally relied on § 5K2.8 in upwardly departing, we cannot conclude that the error in listing invalid grounds for departure "did not affect the district court's selection of the sentence imposed." *Id.* —— U.S. at ——, 112 S.Ct. at 1121.

Consequently, we **REMAND** to the district court for resentencing. We approve of an upward departure for extreme conduct, but we instruct the court to provide a precise methodology for arriving at the particular sentence imposed.