UNITED STATES of America, Plaintiff,

v.

Mark M. JACKSON, and Robert Martinez, Jr., Defendants.

No. 94–40001–01/02–SAC.

United States District Court, D. Kansas.

Dec. 12, 1994.

Thomas M. Bradshaw, Daniel O. Herrington, Armstrong, Teasdale, Schlafly & Davis, Kansas City, MO, for Robert Martinez, Jr.

Thomas J. Bath, Jr., James L. Eisenbrandt, Bryan Cave, Overland Park, KS, for Mark M. Jackson.

Tanya J. Treadway, Office of U.S. Atty., Kansas City, KS, Richard L. Hathaway, Office of U.S. Atty., Topeka, KS, for U.S.

## MEMORANDUM AND ORDER

CROW, District Judge.

The case comes before the court on the sentencing of these defendants. For the court's consideration, the parties submitted sentencing memoranda, oral arguments, and evidence. At the conclusion of the sentencing hearing on December 12, 1994, the court summarily ruled on all pending objections and explained that a written order would follow with additional findings and reasons in support of its rulings. The court submits the following findings and conclusions in support of the sentences imposed at that hearing.

### VICTIM

■ The prosecution originally objected to the presentence investigation reports (PSIRs) for omitting an upward adjustment for official victims pursuant to U.S.S.G. § 3A1.2(A). The prosecution argued that the Postal employees were the "grist" of the defendant's patients-for-money "mill." Since making this objection, the prosecution has received opposing responses from both the defendants and the probation officer. This objection does not appear in the prosecution's sentencing memorandum to the court. By all indications, the prosecution may have conceded or at least waived that objection. Even so, the court will consider it briefly.

A § 3A1.2 adjustment for official victims "applies when specified individuals are victims of the offense," and not "when the only victim is an organization, agency, or the government." U.S.S.G. § 3A1.2, comment. (n. 1). Of the different victims named by the prosecution, the only one possibly fitting this category would be the postal employees referred to Parkview Hospital by Louis Garcia. The evidence of record utterly fails to show that the employees lost money or property or were otherwise harmed by having been treated by Parkview Hospital. Witnesses at trial testified that every patient referred by Garcia needed inpatient care and received appropriate medical care from Parkview Hospital. This testimony rules out opposing inferences that these same patients received unnecessary inpatient care and that they could have been adequately treated through available outpatient programs. Instead of victims, the patients were beneficiaries of not only Parkview's quality medical care but also its routine waiver of deductibles and out-of-pocket expenses. The court overrules the government's objection for a victim adjustment under § 3A1.2.

### NUMBER OF BRIBES

■ The base offense level for bribing a public official is 10. "If the offense involved more than one bribe ..., increase by 2 levels." U.S.S.G. § 2C1.1(b)(1). The commentary to this provision reads:

> Subsection (b)(1) provides an adjustment for offenses involving more than one incident of either bribery or extortion. Related payments that, in essence constitute a single incident of bribery or extortion (e.g., a number of installment payments for a single action) are to be treated as a single bribe or extortion, even if charged in separate counts.

U.S.S.G. § 2C1.1, comment. (n. 6). Relying on this guideline comment, the defendants maintain there was one bribe consisting of the agreement to refer on the average three patients each month in exchange for monthly payments of $3,000. The defendants emphasize their deal was memorialized in a one-year consulting agreement entered on November 1, 1990, and then renewed on October 4, 1991, on nearly identical terms. They say the monthly payments were like installment payments, as Parkview Hospital regularly issued every check in the same amount of $3,000. Their argument is bolstered by the fact that the defendants did not approach Garcia each month with separate offers of money for his referral services.

The prosecution responds that the defendants confuse one bribe with one conspiracy.

While the payments were part of one conspiracy, they were not made for a single action. There was no agreement to pay Garcia a set sum in installments over a specified period of time. Instead, the bribes were paid as long as Garcia referred patients. On one occasion, Garcia received a bonus of another $3,000 for making ten referrals in one month. The prosecution stresses that Garcia received different types of bribes, including checks, expense-paid trips, a calling card, and a cellular phone. The bribes came from two different sources, Parkview Hospital and Charter by the Sea Hospital. The prosecution points to Garcia's testimony that the consulting agreements were mere subterfuges. Even if the written agreements represent to some extent the parties' course of dealings, there was still more than one consulting agreement consummated.

A preponderance of evidence establishes that Garcia received more than one bribe and performed more than a single action. The conspiracy agreement was not for a final fixed sum paid in regular installments in return for a single action from Garcia. Instead, the conspiracy was more open-ended and indefinite in actions, terms, and duration. It was understood that Garcia would receive monthly payments for referring on the average three patients each month for as long as both sides wanted to perform. The evidence does not show that the parties contemplated how much compensation ultimately would be received by Garcia, how many patients ultimately would be referred by him, or how long their conspiracy ultimately would last. While sharing a common purpose, the fifteen separate payments are not so related as to constitute "a single action of bribery."

Other facts also support this conclusion. Garcia was not asked to do just a single act or a single set of acts. Each monthly payment compensated Garcia for his work that month in recommending Parkview Hospital to those postal employees who happened to seek his counsel and for referring some of them to Parkview Hospital. On one occasion, Garcia received a bonus for referring more than three patients in one month. This bonus was in addition to the regular monthly payment and was given in exchange for Garcia doing more than was expected of him. The bribes given to Garcia were not just monthly checks. Garcia also received ex-

pense-paid trips, a calling card, and a cellular phone. The defendants even arranged for Parkview Hospital to pay the airfare for Garcia's brother to attend the funeral of their father.

■ That the defendants are able to distinguish this case from *United States v. Morales,* 11 F.3d 915 (9th Cir.1993), is not decisive. Granted, the court there found multiple bribes based upon numerous payments from different sources, in different amounts, and at different intervals. 11 F.3d at 917. Such factors are common indicators of multiple bribes. The absence of such factors, however, does not necessarily mean there was only one bribe. If additional payments are made to promote different or more work from the bribed official, then the payments are not installment payments but separate bribes. *See United States v. Kahlon,* 38 F.3d 467 (9th Cir.1994). Each monthly payment to Garcia was in return for referring additional patients to Parkview Hospital. On the weight of these findings and conclusions, the court increases the base offense level by two points for multiple bribes as required by § 2C1.1(b)(1).

## AMOUNT OF BRIBE OR LOSS

Section 2C1.1 of the Sentencing Guidelines provides that the base offense level is to be enhanced as follows:

> If [1] the value of the payment, [2] the benefit received or to be received in return for the payment, or [3] the loss to the government from the offense, whichever is greatest, exceeded $2,000, increase by corresponding number of levels from the table in § 2F1.1.

The prosecution argues that the court must choose the greatest of the three calculations and that, in this case, it is the loss to the government or the benefit received. The prosecution insists the sum of $167,654.06 represents either the amount that Parkview Hospital or Garcia-referred patients received as benefits or the amount that the government lost from the Federal Employees Health Benefit ("FEHB") trust fund. The prosecution calculates this sum from what the FEHB health benefit plans say they overpaid as a result of not knowing that

Parkview Hospital had automatically waived the deductibles and co-insurance requirements for the patients referred by Garcia. Most of the participating FEHB health benefit plans had policies that reduced the benefits paid by the amount waived by the health care provider. Since the benefit plans here did not know of Parkview Hospital's waiver, they did not reduce their payments to Parkview Hospital by the amount of waived deductibles and expenses.

The prosecution presents documents and diagrams from the United States Office of Personnel Management ("OPM") showing that the FEHB health benefit plans pay the patient's claims and then seek reimbursement from a FEHB fund which is administered by the United States Treasury through a letter of credit arrangement. This fund consists of the premiums paid by the government (73%) and the premiums deducted from the government employee's paycheck (27%). If claims exceed premiums collected during a period, FEHB trust fund special reserves make up the difference. These special reserves[1] are made up of premium allotments and prior premium surpluses. Thus, the prosecution considers "the FEHBP ... [to be] a program 100% funded by U.S. taxpayer dollars." (Dk. 215 at 8).

The prosecution maintains that the blanket waiver of deductibles and out-of-pocket expenses for Garcia-referred patients was an essential and integral part of the bribery conspiracy. The waivers enabled Garcia to induce patients to choose Parkview Hospital over other mental health facilities. The prosecution disputes that waivers are an ordinary course of business and cites Garcia's testimony that he had little success obtaining waivers other than from Parkview Hospital.

Finally, the prosecution contends that the defendants' bribery conspiracy **resulted in** a loss to the government or a benefit to Parkview or to the patients referred by Garcia. The prosecution bases its contention on the fact that "Parkview Hospital did not notify the FEHBP insurance providers about the waivers." (Dk. 215 at 13). Even if not a loss to the government, the overpayments, in the prosecution's opinion, were a net benefit to Parkview Hospital or to Garcia's patients. Alternatively, the government asks for an upward departure arguing that using the amount of the bribe does not adequately reflect the seriousness of the defendants' crime.

The defendants attack the prosecution's theory as untenable thinking. First, the defendants were not charged with defrauding the government of any money or property. Second, the loss to the government theory "is nothing short of rank speculation." Third, there is no evidence that defendants caused Parkview Hospital to withhold notice to the insurance carriers of these waivers. Fourth, there is no evidence that Parkview Hospital had any duty by law or contract to notify insurance carriers of the same. Fifth, the FEHB fund is divided into special reserves for each plan, and a benefit plan submits its claims for payment from its designated reserves or fund. The FEHB fund is administered but not owned by the government. Like a trustee, OPM owes duties to administer the fund consistent with the powers bestowed by statute and regulation. As for the enrollees, their rights are limited to an interest in having those funds used to pay their claims.

 The government has the burden to prove by a preponderance of evidence that specific offense characteristics exist as to warrant increasing the base offense level. *See United States v. Fetherolf,* 21 F.3d 998, 1001 (10th Cir.1994). Specifically, the government has the burden to prove the amount of the loss. *United States v. McAlpine,* 32 F.3d 484, 487 (10th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 610, 130 L.Ed.2d 520 (U.S.1994). "The calculation of actual or intended loss need not be exact." *United States v. Reddeck,* 22 F.3d 1504, 1512 (10th Cir.1994).

The court finds that the government has not carried its burden of proving that **as a**

---

**1.** At the sentencing hearing, the defendants introduced the contract between one insurance carrier, Government Employees Hospital Association ("GEHA"), and the Office of Personnel Manage- ment. The defendant's expert pointed out that by the terms of this contract if special reserves are exhausted, then GEHA bears the ultimate risk of payment on enrollees' claims.

**result of the bribery scheme or conspiracy,** the government suffered a loss in the amount of $167,654.06. Nor has it proved that some entity or persons received a benefit in the same amount.

The prosecution presented testimony from the different health benefit plan representatives that their respective policies allow for some reduction in the paid claim when a health care provider routinely waives any deductibles or expenses. The representatives further testified as to what they would have done if they had known of Parkview Hospital's blanket waiver given to patients referred by Garcia. By their calculations, their different plans had overpaid the claims submitted by Parkview Hospital because of not knowing about this waiver practice. They also testified, however, that they had not attempted to collect these or any other alleged overpayments to Parkview Hospital. Despite this lack of collection efforts, the court believes the different plans would have reduced the paid claims by the amount of the Parkview's blanket waivers.

■ The central issue remains whether a part of the defendants' scheme or conspiracy was to conceal these waivers from the carriers. It is undisputed that the defendants caused Parkview Hospital to automatically waive deductibles and out-of-pocket expenses for those patients referred by Garcia. On the other hand, it is disputed and not proved whether a part of the defendants' scheme was to conceal this routine waiver practice from the health benefit plans. There is nothing of record to show that either defendant caused Parkview Hospital to withhold this waiver information from the benefit plans. Nor is there evidence that the defendants were involved with any plan or scheme to keep the FEHB health benefit plans from learning about the waiver. The evidence at trial showed the defendants openly instructed others to waive the deductibles without taking any measures to keep this matter a secret. At the sentencing hearing, Joyce Nuss, the Parkview Hospital supervisor in charge of patient claim submissions from 1990 to the present, testified she did not learn of any responsibility to report the waiver until just six months ago. In the court's judgment, the prosecution has not shown by a preponderance of evidence that the defendants knew of these waiver exclusions, that they knew Parkview Hospital was to report these waivers,[2] and that they planned or schemed to conceal the waivers or to exploit Parkview Hospital's practice of not reporting the waivers.

Since an overpayment cannot occur without both a routine waiver and the health benefit plans remaining ignorant of it, the court believes the defendants should not be tagged with the overpayments unless the prosecution shows that the defendants knew or should have reasonably foreseen that their conspiracy, as planned and implemented, would likely result in the overpayments. The prosecution has not carried its burden of proof.

■ For purposes only of determining the loss or benefit under § 2C1.1 of the Sentencing Guidelines, the court does not accept the proposition that the FEHB fund reserves, held and designated exclusively for the health care benefit plans, are entirely "government" monies. Each health benefit plan representative agreed with the prosecutor that his or her plan was funded "100% with federal government money." Besides the representatives, C.R. Gillum, a special agent with OPM, agreed that the FEHBP was "100% federally funded." The opinion of these witnesses, competent or not,[3] is that it matters not where the money comes from,

---

2. The prosecution further has failed to cite the relevant law or to present any competent evidence showing that Parkview Hospital had a contractual or legal duty *to inform* FEHB health benefit plans of the blanket waiver. Rather than finding that a contract, regulation or law does not exist imposing such a duty, the court is simply saying that the government has not cited nor presented the court with any which are relevant here.

3. The plan representatives did not appear to know what was done with the premiums collected from employees. Their knowledge of the reserve funds, the manner of the funds' operation, and the lawful use of those funds was also vague. From what they were asked, the representatives showed that their conclusion about government funding was based on only the appearance created by the OPM's and FEHBP's administrative duties.

for whom it is held, or for what it can be used.. If the money comes from a fund administered by a governmental entity, then they consider it to be government money. The court does not believe it fair or logical to determine criminal accountability on such abstract, if not arbitrary, characterizations.[4] From the scant record and conclusory arguments, the court cannot find that the government suffers a dollar for dollar loss when the FEHB plan funds are used to overpay health care benefit claims. Nor can the court reasonably estimate the amount of any loss from what has been presented.

 The prosecution's case is similarly deficient in proving the net value of any benefit allegedly received by Parkview Hospital or by Garcia-referred patients. The amount of insurance overpayments may be a measure of benefit, but to calculate its net value, one needs to know what Parkview Hospital would have been able to recover or what the patients would been financially able to pay without the blanket waiver. It would be necessary also to know what circumstances amounted to a non-routine waiver and whether any of the patients qualified for non-routine waivers of deductibles and expenses.

In summary, the government has not carried its burden of providing a preponderance of evidence from which it can reasonably be inferred that the bribery conspiracy caused a loss to the government or a benefit to Parkview or to Garcia's patients in some amount capable. of reasonable estimation. The government's proof, arguments, and theories are more a matter of conjecture than inference. For this reason, I find that of the three calculations methods at § 2C1.1(b)(2)(A), the greatest one is the value of the bribes paid Garcia. I also find that this sum and the five-level increase associated with it adequately reflects the seriousness of the offense

here. The reasons given by the prosecution for an upward departure are not persuasive.

## OBSTRUCTION OF JUSTICE

 A sentencing court may consider evidence applicable to a charge upon which the defendant was acquitted. *United States v. Coleman,* 947 F.2d 1424, 1429 (10th Cir. 1991), *cert. denied,* 503 U.S. 972, 112 S.Ct. 1590, 118 L.Ed.2d 307 (1992). "All circuits except the Ninth, permit the sentencing court to consider the facts underlying an acquittal in upwardly departing or enhancing a sentence." *United States v. Kelly,* 1 F.3d 1137, 1139 n. 1 (10th Cir.1993) (citations omitted).

 The government contends that Garcia's testimony and the corroborating documents prove by a preponderance of evidence that the defendants obstructed justice by instructing Garcia to stick with the story. Besides Garcia's testimony, the government points to telephone records showing that Garcia left his home and returned Martinez's call from a pay phone to avoid the possibility of a phone tap. Another corroborating fact is that Garcia stuck with the story in his first statement to government agents. Lastly, the government weighs Garcia's credibility as more than Martinez's.

The defendants argue that to rely on this evidence to enhance their sentence would violate due process and double jeopardy. The Tenth Circuit in *Kelly* passed on the chance to decide these same constitutional challenges.

Rather than taking a stand on the constitutional issues, I find that the preponderance of reliable evidence does not show that the defendants "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation...." U.S.S.G. § 3C1.1. The only evidence that the defendants attempted to intimidate or influence Louis Garcia in his grand jury testimony came from Garcia.

---

**4.** If common sense were invited to the discussion, it might argue for a different result. As explained and understood by federal employees, health insurance is a benefit paid them; it is not unlike what private employees might earn. A portion of the health insurance cost is deducted directly from the employee's paycheck. The remaining portion of the health insurance cost is "contributed" by the employer, which is here the federal government. Health insurance is a benefit earned by the employee right along with the salary and other benefits. Granted, the health insurance benefit here has been structured so that the federal government retains administrative control over its distribution. By statute, those funds, however, can be used only in payment of the enrollee's health care claims or related administrative costs. 5 U.S.C. § 8909.

Like the jury, I did not find Garcia's testimony in this regard to be as credible as that of the defendant Martinez's. What the government calls "corroborating evidence" does not measurably affect the court's evaluation of witness credibility. The phone toll records only prove that phone calls were made, not what was said during them. The circumstances of one call may suggest an effort to avoid detection, but from whom or what is more a guess than an inference. Garcia testified that during the summer of 1993 Martinez called him approximately once a week about referrals to Charter by the Sea Hospital. This evidences another reason for Martinez to call Garcia other than to warn him about the grand jury investigation into Parkview Hospital. Garcia did refer patients to Charter by the Sea Hospital during that period. In fact, just one week before Martinez's alleged clandestine call to Garcia, Charter by the Sea Hospital had issued a check to Garcia covering expenses for one of Garcia's committees. Moreover, I believe that Garcia had a powerful motive to find something that could explain or justify his false statement to federal agents on September 1, 1993. That Garcia may have manufactured this explanation is further indicated by the fact that he did not mention the defendant Jackson in his grand jury testimony about the August 29th telephone call from Martinez but later added in his trial testimony that Martinez had related the call was being made on Jackson's instruction. Finally, the phone calls between Jackson's residence and Martinez's residence can be innocently explained by the fact that Martinez's son was staying with Jackson at the time. The court does not find that the evidence warrants an enhancement for obstruction of justice.

## ROLE IN THE OFFENSE

The government objects that the defendants were co-leaders of the conspiracy with both deserving of a two-level enhancement. Because he was a latecomer to this conspiracy organized by Garcia and Martinez, the defendant Jackson objects to any enhancement for an aggravated role. The defendant Martinez objects that he is entitled to a two-level reduction as a minor participant.

Section 3B1.1 of the Sentencing Guidelines provides that two levels are given to the offense level "[i]f the defendant was an organizer, leader, manager or supervisor in any criminal activity." In deciding this issue, a court should consider the following factors:

the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy. This adjustment does not apply to a defendant who merely suggests committing the offense.

U.S.S.G. § 3B1.1, comment (n. 4). The commentary to this section includes the following as background:

This section provides a range of adjustments to increase the offense level based upon the size of a criminal organization ... and the degree to which the defendant was responsible for committing the offense. This adjustment is included primarily because of concerns about relative responsibility. However, it is also likely that persons who exercise a supervisory or managerial role in the commission of an offense tend to profit more from it and present a greater danger to the public and/or are more likely to recidivate. The Commission's intent is that this adjustment should increase with the both the size of the organization and the degree of the defendant's responsibility.

U.S.S.G. § 3B1.1, comment. (backg'd).

 Section 3B1.1 adjusts the offense level upward depending upon a defendant's particular role in criminal activity. It exists as a guideline " 'primarily because of concerns about relative responsibility.' " *United States v. Brown,* 944 F.2d 1377, 1380 (7th Cir.1991) (quoting *United States v. Herrera,* 878 F.2d 997, 1000 (7th Cir.1989)). The two-level enhancement at § 3B1.1(c) appears intended for organizers and managers of small

criminal enterprises which are not extensive in scope and involve fewer than five participants. *United States v. Rutter*, 897 F.2d 1558, 1563 (10th Cir.), *cert. denied*, 498 U.S. 829, 111 S.Ct. 88, 112 L.Ed.2d 60 (1990). The government has the burden of proving by a preponderance of evidence the predicate facts for finding that a defendant exercised a managerial or supervisory role. *United States v. Mays*, 902 F.2d 1501, 1502–03 (10th Cir.1990). All relevant conduct, as defined in § 1B1.3, may be considered in determining a § 3B1.1 adjustment. *United States v. Saucedo*, 950 F.2d 1508, 1513 (10th Cir.1991) (citing U.S.S.G. Ch. 3, Pt. B, intro. comment.)

■ The court finds that the defendant Jackson held the most culpable role in relation to the offenses of conviction. Decisionmaking authority resided with him. He decided to bring Garcia to Parkview Hospital. He negotiated the terms of the money-for-patients conspiracy. He devised a consulting agreement as the cover for the conspiracy. He made the arrangements for Garcia to be paid monthly in checks sent by Federal Express, for Garcia to have his travel expenses paid, and for Garcia's patients to have their deductibles automatically waived. He instructed Garcia on when to appear in Topeka and when to present seminars as part of the consulting agreement cover. He prepared the bogus letters thanking Garcia for consulting and marketing services never performed and directed Garcia to prepare invoices consistent with those letters. Moreover, the defendant Jackson received bonuses which were calculated in part on patient census. By a preponderance of evidence, the court finds that the defendant Jackson was a leader and manager of the offenses of conviction.

■ From its review of the evidence, the court finds that throughout the charged conspiracy Martinez acted more like a middle man rather than an organizer, leader or supervisor. Sure, he gave orders to Garcia, but he was simply carrying out Jackson's directions. He was Jackson's voice or conduit to Garcia. There is little in the record to suggest that Martinez exercised independent discretion and authority in his supervision of Garcia.

The court is rightly concerned about achieving the purpose of § 3B1.1. It was intended to empower courts to make adjustments based on relative responsibility in the offense. A two-level enhancement for both Jackson and Martinez blurs, what I believe, are distinctly different roles in the conspiracy. Jackson's conduct was far more consistent with that exercised by an organizer, leader, manager and supervisor of a conspiracy. He instructed Martinez what to tell Garcia. What authority or responsibility that Martinez had and exercised was more a function of being closer to Jackson in his personal and working relationship than it was a function of having a managerial or supervisory role in the criminal conspiracy.

On the other hand, Martinez was actively involved in planning and implementing the conspiracy. He knew and understood the scope and purpose of the conspiracy and what was expected of each participant. His role in the conspiracy was not minor. He was the contact person between Jackson and Garcia. He introduced Garcia to Jackson and later monitored and facilitated Garcia's efforts. While he is not entitled to a two-level decrease given to minor participants, Martinez does avoid a two-level increase given for an aggravated role in the criminal activity.

## MARTINEZ'S CRIMINAL HISTORY

■ Martinez argues he should receive no points for his deferred adjudication of guilt in Texas for distribution of cocaine. The District Court of Harris County, Texas terminated his probation on March 22, 1994, allowing him to withdraw his guilty plea, and it dismissed the charge and ordered the judgment of conviction to be set aside. Looking at § 4A1.2, application note 10, Martinez insists his state conviction was expunged by this state court order.

In *United States v. Giraldo–Lara*, 919 F.2d 19, 22 (5th Cir.1990), it was held that a "deferred adjudication probation" entered by a Texas court was an adjudication of guilt and, therefore, was a "prior sentence" under the Guidelines. Because the defendant had entered a plea of guilty in the Texas prosecution, this qualified as a diversionary disposition resulting from an admission of guilt.

§ 4A1.2(f). *Id.* This precedent is on all fours here.

Martinez erroneously argues his dismissal and discharge qualifies as an expungement. The court must determine whether under Texas law the dismissal and discharge of a deferred adjudication of guilt is an expungement of the admission of guilt or should be treated as expungement. *See United States v. Johnson,* 941 F.2d 1102, 1111 (10th Cir. 1991). The Texas Code of Criminal Procedure Article 42.12, Section 5(c) provides in relevant part:

> On expiration of a community supervision period imposed under Subsection (a) of this section, if the judge has not proceeded to adjudication of guilt, the judge shall dismiss the proceedings against the defendant and discharge him. The judge may dismiss the proceedings and discharge the defendant prior to the expiration of the term of community supervision if in the judge's opinion the best interest of society and the defendant will be served. A dismissal and discharge under this section may not be deemed a conviction for the purposes of disqualifications or disabilities imposed by law for conviction of an offense, except that: (1) upon conviction of a subsequent offense, the fact that the defendant had previously received community supervision with a deferred adjudication of guilt shall be admissible before the court or jury to be considered on the issue of penalty. . . .

Under Texas law, an order dismissing and discharging a prior deferred adjudication probation status does not operate as an expungement of the prior deferred adjudication proceeding. Martinez's argument to the contrary is without merit.

 Martinez seeks a downward adjustment of his criminal history category from III to II arguing that a III overstates the seriousness of his past. Section 4A1.3 provides in part:

> There may be cases where the court concludes that a defendant's criminal history category significantly over-represents the seriousness of a defendant's criminal history or the likelihood that the defendant will commit further crimes. An example might

include the case of a defendant with two minor misdemeanor convictions close to ten years prior to the instance offense and no other evidence of prior criminal behavior in the intervening period. The court may conclude that the defendant's criminal history was significantly less serious than that of most defendants in the same criminal history category (Category II), and therefore consider a downward departure from the guidelines.

This provision is a downward departure "'guided' by the guidelines themselves." *United States v. Bowser,* 941 F.2d 1019, 1024 (10th Cir.1991) (quoting *United States v. Maldonado–Campos,* 920 F.2d 714, 719 (10th Cir.1990)). In *Maldonado–Campos,* the Tenth Circuit laid out the test governing such downward departures:

> Downward departures based upon criminal history are made pursuant to 18 U.S.C. § 3553(b) and are reviewed under the same three-part test for evaluating upward departures contained in *United States v. White,* 893 F.2d 276, 278 (10th Cir.1990) (citations omitted). We first determine *de novo* whether the circumstances admit of a factor not adequately taken into account by the Sentencing Commission which would justify departure. (citation omitted). Next, we review the district court's factual determinations supporting departure under the clearly erroneous standard. (citation omitted). Finally, under 18 U.S.C. § 3742(e)(3) we determine whether the degree of departure was reasonable. (citation omitted).

920 F.2d at 719–20. General harshness and inflexibility of guidelines are not proper reasons for a downward departure. " '[G]rounds for departure must be specific to the particular defendant's commission of a particular offense under a particular set of circumstances.' " *Maldonado–Campos,* 920 F.2d at 720 (quoting *United States v. Aguilar–Pena,* 887 F.2d 347, 353 (1st Cir.1989)). Besides the seriousness of the criminal history, the court should also consider recidivism in deciding on downward departure. *Id.* A particular combination of factors may exist which were not considered sufficiently by the Commission in the guidelines. *Bowser,* 941

F.2d at 1025 (prior convictions were over twenty years old, prior crimes were committed within two months of each other, and prior sentences were imposed concurrently).

 The defendant Martinez has not articulated any circumstances not adequately taken into account by the Sentencing Commission which would justify the requested departure. The defendant Martinez was indicted for filing a false food stamp statement only after he failed to perform the conditions of pre-trial diversion. By the terms of the diversion agreement, the defendant had twelve months to repay the sum of $1,491. His failure or even inability to repay this sum explains the lost right to pre-trial diversion, but it does not explain or mitigate the criminal conduct for which he was eventually convicted. The court does not consider a criminal history category of three to overstate the seriousness of the defendant's criminal past. The circumstances argued by the defendant do not justify the requested departure.

## MARTINEZ'S MOTION FOR DOWNWARD DEPARTURE

 The defendant Martinez moves for a downward departure. He first argues that this case is "atypical of normal bribery cases" and not within the "heartland" of cases usually governed by this particular guideline. The unique features here, in Martinez's opinion, are the absence of financial harm to the government and the absence of direct personal gain to the defendant Martinez.

 The court is not convinced that either feature takes this case out of the "heartland." This guideline was intended to cover a broad range of official bribery:

The object and nature of a bribe may vary widely from case to case. In some cases, the object may be commercial advantage (*e.g.,* preferential treatment in the award of a government contract). In others, the object may be issuance of a license to which the recipient is not entitled. In still others, the object may be the obstruction of justice. Consequently, a guideline for the offense must be designed to cover diverse situations.

U.S.S.G. **section** 2C1.1, comment. (backg'd). The Sentencing Commission, in providing three ways to measure the financial impact of the bribery, recognized that the losses and benefits resulting from bribery offenses can vary greatly in amount, nature, and relative degree. *See* U.S.S.G. § 2C1.1(b)(2)(A). There is nothing to suggest that this Guideline contemplates only cases where government has suffered a direct financial loss or where the defendant has enjoyed a direct financial benefit. Therefore, the court does not find these circumstances to be outside the "heartland" of a "typical" bribery case which would warrant a downward departure.

Even if this Guideline were to be read so narrowly, the defendant Martinez cannot show that either feature is missing from this case. The court earlier found that the government did not suffer a financial harm that could be reasonably calculated from the prosecution's evidence. Despite this finding, the court has no problem concluding that the defendants' bribery conspiracy ultimately caused some loss to the government in the form of increased health care benefit premiums, additional administrative charges, or the lost services of Garcia. Though these amounts cannot be calculated from the record, the fact of the loss is more likely true than not. The same can be said about Martinez's benefit from the bribery conspiracy. Though the conspiracy was not set up to provide him with particular immediate rewards, its existence and operation secured his continued employment with Parkview Hospital. It also afforded him better employment terms and more benefits than others employed in the marketing department. In short, this case, like most official bribery offenses, harmed the government and benefitted the defendants.

[21] Martinez also contends that the five-level adjustment based on the amount of the bribes is disproportional to his role in the bribery conspiracy. The court based this five-level adjustment on the amount of the bribe, totaling $49,379.20. The court believes there is a connection between this amount and Martinez's participation. First, Martinez told Jackson about his prior deal with Garcia at Bowling Green where Martinez

arranged for Garcia to be paid $3,500 each month for referring three patients. The deal reached at Parkview was for similar terms, $3,000 a month for three patients. Second, Martinez arranged for and participated in some of the benefits given to Garcia for his referral services. This included free trips, meals, golf, and entertainment. Finally, Martinez's annual salary at Parkview was in line with the amount of bribes paid Garcia. In sum, Martinez influenced the amount of the bribes and benefitted from the bribery conspiracy in like degree. The court finds that the five-level adjustment is connected to Martinez's role in the conspiracy and does not overstate the seriousness of it. Thus, the defendant's request and motion for a downward departure is denied.

## MARTINEZ'S REQUEST FOR NEW TRIAL

In his motion for new trial, the defendant Martinez argued that if his trial had been severed and if the defendant Jackson had been tried first then the defendant Jackson would have testified in favor of Martinez. In his supplemental brief in support of that motion, Martinez asked for a hearing to present Jackson's testimony or, alternatively, for leave to present Jackson's affidavit. The court entered its order denying both defendants' motions for new trial before the defendant Martinez submitted Jackson's testimony or affidavit. At the conclusion of the sentencing hearing on December 9, 1994, Mr. Bradshaw, Martinez's defense counsel, stated for the record that he understood the defendant Jackson would exercise his Fifth Amendment right and not testify or submit an affidavit in support of the defendant Martinez's motion for new trial. The court has reviewed its order of November 7, 1994, in particular the ruling that it had not abused its discretion in denying a severance to Martinez. The court there found that the record did not show an unconditional commitment from Jackson, prior to trial, to testify on behalf of Martinez. The court further found that any prejudice to Martinez from not having Jackson's testimony was outweighed by countervailing considerations. The court believes that ruling was correct then and now.

IT IS THEREFORE ORDERED that the government's and the defendants' objections are overruled and/or granted consistent with the findings and conclusions stated above;

IT IS FURTHER ORDERED that the defendant Martinez's motion for downward departure (Dk. 212) is denied;

IT IS FURTHER ORDERED that in light of Mr. Bradshaw's comments on December 9, 1994, made on behalf of the defendant Martinez, the court reconsiders and reaffirms its order of November 7, 1994, denying a new trial to both defendants.