**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 9 2001**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff-Appellant,

v.

MICHAEL LEE HANSON,

    Defendant-Appellee.

No. 00-5094

---

Appeal from the United States District Court
for the Northern District of Oklahoma
(D.C. No. 99-CR-170-H)

---

Richard A. Friedman, Appellate Section, United States Department of Justice, Washington, D.C. (Steven C. Lewis, United States Attorney, Thomas Scott Woodward, Assistant United States Attorney, Office of the United States Attorney, Tulsa, Oklahoma, with him on the briefs), for Plaintiff-Appellant.

Jack Schisler, Assistant Federal Public Defender (Stephen J. Knorr, Federal Public Defender, with him on the brief), Office of the Federal Public Defender, Tulsa, Oklahoma, for Defendant-Appellee.

---

Before **EBEL**, **PORFILIO**, and **HENRY**, Circuit Judges.

---

**HENRY**, Circuit Judge.

---

    After the defendant Michael Lee Hanson pleaded guilty to second-degree murder

in Indian country and using a firearm during a crime of violence, the government filed a motion for upward departure on the following grounds: (1) that the murder was premeditated; (2) that the murder was committed in order to facilitate a robbery; and (3) that Mr. Hanson's conduct was unusually heinous, cruel, and brutal. The district court denied the motion, and the government now appeals.

Because the district court's ruling is based on the legal conclusion that it lacked the authority to depart, we first conclude that we have jurisdiction to consider this appeal. We further conclude that the district court properly denied the government's motion on the first two grounds. In light of our ruling in United States v. Kelly, 1 F.3d 1137 (10th Cir. 1993), the sentencing court may not depart upward from the Guideline range for second-degree murder on grounds that recharacterize the offense as a first-degree murder. However, as to the third ground for departure, we conclude that the district court had the authority under USSG § 5K2.8 to depart upward on the basis of extreme conduct in which Mr. Hanson engaged after the victim's death. Accordingly, we affirm in part, reverse in part, and remand the case to the district court for further proceedings consistent with this opinion.

## I. BACKGROUND

The government charged Mr. Hanson with five offenses arising out of the murder of his father, Milford Hanson, in Indian country: (1) first-degree murder by killing during

2

the perpetuation of a robbery and with malice aforethought; (2) first-degree murder by killing with premeditation and malice aforethought; (3) second-degree murder by killing with malice aforethought; (4) assault to commit murder; and (5) use of a firearm in furtherance of a crime of violence.[1]  Mr. Hanson and the government entered into an agreement under which he would plead guilty to the second-degree murder and firearm counts.  He agreed not to seek a sentence of less than thirty years' imprisonment, while the government "specifically reserve[d] its right to seek any punishment up to and including the statutory maximum of life imprisonment without parole."  Aplt's App. at 18 (Plea Agreement, filed Jan. 7, 2000).  The district court conducted a hearing and accepted Mr. Hanson's plea of guilty to the two counts.

The presentence report and the government's sentencing memorandum describe the crime in some detail.  On November 10, 1999, Helen Hanson reported to the Craig County Sheriff's office that her husband, Milford Hanson, was missing.  She added that jewelry, a checkbook, and a wallet were also missing.  In light of inconsistent statements provided by the defendant, law enforcement agents considered him a suspect.  They recorded a meeting between Mr. Hanson and his girlfriend in which he confessed that he had shot his father, wrapped the body in plastic, and buried him on the family property.

---

[1] The indictment alleged that both Mr. Hanson and his father are Indians.  Thus, the murder counts alleged violations of 18 U.S.C. §§ 1111, 1151, and 1153.  The assault count alleged a violation of 18 U.S.C. §§ 113(a), 1151, and 1153.  Finally, the firearm count alleged a violation of 18 U.S.C. § 924(c).

An autopsy report indicated that Milford Hanson had suffered eight multiple sharp force injuries to the right shoulder, upper right arm, left chin, and the right forehead.  See id. at 54 ¶ 19 (presentence report).  Five of these wounds fractured the underlying bone. The autopsy further concluded that Milford Hansen had received six gunshot wounds to the head.  Each bullet appeared to have traveled in a downward direction.  See id. at 54 ¶ 17.

At the change of plea hearing, Mr. Hanson stated to the court that he had "struggled with my father . . . over a gun I had in my possession.  The gun . . . went off during the struggle striking my father in the temple.  After he fell to the ground he appeared to still be moving and I then shot him several times in the head." Id. at 42 (Change of Plea Hr'g, Jan. 7, 2000).

In the sentencing proceedings, the government contended that Mr. Hanson had lied to the court in order to disguise the fact that the murder was premeditated and that he had intended to rob his father.  The government pointed to evidence that Mr. Hanson had removed his father's jewelry and wallet and had given his girlfriend money following the murder.  The government also noted that, on the day before the murder, Mr. Hanson had told her that he had just won $60,000 in the Louisiana lottery.  In the recorded conversation after the murder, Mr. Hanson had valued his father's jewelry at $60,000. Prior to the murder, Mr. Hanson had informed his girlfriend that his parents were going to take an extended trip out of town.

4

In light of this evidence, the government requested that the district court depart upward from the Guideline range for second-degree murder.[2] It urged the court to consider the fact that the murder was premeditated. See id. at 79 (Sentencing Memorandum, filed May 3, 2000). It also contended that Mr. Hanson committed the murder for the purpose of robbing his father. See id. at 77-78 (citing USSG § 5K2.9). Finally, invoking USSG § 5K2.8, it argued that the murder was "extraordinarily brutal, heinous, [and] degrading and [that] there was an unnecessary degree of gratuitous damage and concomitant suffering." Id. at 77.

At the sentencing hearing, the court denied the government's request for an upward departure. It sentenced Mr. Hanson to 210 months' imprisonment for the second-degree murder conviction and to a consecutive term of 210 months' imprisonment for the firearm offense.

## II. DISCUSSION

---

[2] For second-degree murder, the maximum sentence under the statute is life imprisonment. See 18 U.S.C. § 1111. Under USSG § 2A1.2, the basic offense level for second-degree murder is thirty-three. The presentence report recommended a two-level increase for obstruction of justice. In light of Mr. Hanson's criminal history category (I), the Guideline range was thus 168 to 210 months. See Aplt's App. at 62 (presentence report).

On appeal, the government contends that the district court erred in denying its motion for an upward departure. According to the government, the fact that the murder was premeditated and the fact that it was committed in order to facilitate the robbery of Milford Hanson are factors that were not adequately taken into account when the Sentencing Commission formulated the guideline for second-degree murder. Thus, it maintains, the district court erred in concluding that it could not depart on these grounds. As to departure on the grounds that Mr. Hanson engaged in "extreme conduct," see USSG § 5K2.8, the government contends that the district court interpreted the Guideline provision incorrectly. According to the government, a defendant may engage in extreme conduct even if the victim is unconscious or dead. Therefore, the district court also had the discretion to depart upward under this provision of the Guidelines.

## A. Appellate Jurisdiction

Because our authority to review a district court's departure decisions is limited, we must first determine whether we have jurisdiction over this appeal. As a general rule, we "cannot exercise jurisdiction to review a sentencing court's refusal to depart from the Guidelines, either upward or downward, unless the court refused to depart because it interpreted the Guidelines to deprive it of the authority to do so." United States v. Fortier, 180 F.3d 1217, 1231 (10th Cir. 1999). We view ambiguous statements by the judge as indicating that he or she was aware of the legal authority to depart but exercised

6

discretion not to do so.  See id.  See, e.g., United States v. Castillo, 140 F.3d 874, 888 (10th Cir. 1998) (stating that the district court "thought that it had no authority to depart on the grounds offered by the defendant" but that it "knew it had authority to depart if the facts of the case had supported such a departure"; concluding that, as a result, the appellate court lacked jurisdiction to review the refusal to depart downward).  Thus, "unless the judge's language unambiguously states that the judge does not believe he has authority to [upward or] downward depart, we will not review his decision."  United States v. Rodriguez, 30 F.3d 1318, 1319 (10th Cir. 1994).

In this case, the government argues that there are three grounds supporting upward departure:  premeditation, the commission of the murder in facilitation of a robbery, and the defendant's extreme conduct.  Accordingly, we must examine the district judge's statements as to each ground, asking whether he unambiguously stated that he lacked discretion to depart and whether, as a result, we have jurisdiction over each issue.

With regard to the first two grounds, the judge's statements at the sentencing hearing indicate that he believed that the plea agreement was inconsistent with the government's request for an upward departure.  In particular, the judge asked about the Guideline provisions for second-degree murder and stated that his concern was "when somebody offers somebody a plea for second degree, and that plea is accepted, then my ability to do what I think is justice in this case is limited by the guidelines."  Aplt's App. at 183 (Sentencing Hr'g, May 3, 2000).  He then asked Mr. Hanson's counsel if he agreed

7

that "even though I find myself in enormous agreement with the analysis of the heinousness and treachery of these acts, I'm no longer free to simply ignore [the second-degree murder guideline] that existed at the time the plea was entered and to depart as I see fit." Id. (emphasis added).

The judge emphasized it was the prosecutor's decision to offer Mr. Hanson the opportunity to plead guilty to second-degree murder that had divested the court of discretion. Thus, he questioned the prosecutor about the reasons for offering Mr. Hanson the plea agreement and expressed his frustration that "I'm the only one who's been left out of this plea agreement." Id. at 188. He added that the prosecutor had "cabined my responsibility significantly when you offered to enter a plea." Id. at 190.

These remarks establish that the judge grounded his denial of the government's upward departure motion on a legal interpretation of the Guidelines—that, in sentencing a defendant for second-degree murder, he could not depart upward from the guideline range on grounds that the offense possessed one or more characteristics that made it a first-degree murder. Moreover, from our review of the record, we conclude that the judge's assessment of his lack of authority was not ambiguous. His remarks evince a belief that he possessed no authority whatsoever to depart, that, as heinous as the offense might be, he could not depart upward on grounds indicating that it was actually a first-degree murder. Accordingly, we conclude that we have jurisdiction to review the denial of the government's motion seeking departure on the grounds that the murder was premeditated

8

and that it was committed in facilitation of a robbery. See United States v. Barrera-Barron, 996 F.2d 244, 245 (10th Cir. 1993) (stating that this court has jurisdiction to review a district court's refusal to depart if "it erroneously interpreted the Guidelines as depriving it of the power to depart based on the proffered circumstances").

As to the third ground for departure sought by the government—that Mr. Hanson's conduct was "unusually heinous, cruel, brutal, or degrading to the victim," USSG § 5K2.8,—the judge's statements demonstrate a similar view of his lack of authority. In particular, he explained that an upward departure under § 5K2.8 requires that "the victim feel the extreme conduct." Aplt's App. at 194. (Sentencing Hr'g, May 3, 2000). He added that he could consider "what [the defendant] did in the last two minutes of [the victim's] life, not what he did after he shot him and put him in the kitty litter box." Id. The judge thus relied on his interpretation of the Guidelines to conclude that he lacked authority to depart upward.

Accordingly, as to each of the three grounds for the government's motion, the district court based its denial of upward departure on a legal interpretation that it lacked authority to depart. We therefore have jurisdiction over the government's appeal.

B. Upward Departure

9

As a general rule, a sentencing court may depart from the applicable Sentencing Guidelines if it finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." 18 U.S.C. § 3553(b); see also USSG § 5K2.0 ("identifying some of the factors that the Commission has not been able to take into account fully in formulating the guidelines"). In order to determine whether a particular circumstance was adequately taken into account by the Sentencing Commission, the court must "'consider only the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission.'" Koon v. United States, 518 U.S. 81, 92-93 (1996) (quoting 18 U.S.C. § 3553(b)).

The Sentencing Commission has explained that the sentencing court should "'treat each guideline as carving out a 'heartland,' a set of typical cases embodying the conduct that each guideline describes.'" Id. at 93 (quoting 1995 USSG ch. 1, pt A, intro. comment. 4(b)). Accordingly, in an atypical case, "'one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether departure is warranted.'" Id. (quoting same).

The Commission has provided additional guidance for departure decisions by listing certain factors that may never constitute a basis for departure, as well as certain factors that are encouraged or discouraged. See id. at 93-95. If the factor is an encouraged basis for departure, then "the court is authorized to depart if the applicable

Guideline does not already take it into account." Id. at 96. On the other hand, "[i]f the special factor is a discouraged factor, or an encouraged factor already taken into account by the applicable Guideline, the court should depart only if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present." Id. Finally, if a factor is not mentioned in the Guidelines the court must consider the "structure and theory of both relevant individual Guidelines and the Guidelines taken as a whole" and decide whether the factor is "sufficient to take the case out of the Guideline's heartland." Id. (internal quotation marks omitted). The Commission has indicated that departures based on unmentioned factors will be "highly infrequent." Id. (internal quotation marks omitted).

On appeal, the district court's decision to depart is reviewed "under a unitary abuse-of-discretion standard which 'includes review to determine that the discretion [of the district court] was not guided by erroneous legal conclusions.'" United States v. Collins, 122 F.3d 1297, 1302 (10th Cir. 1997) (quoting Koon, 518 U.S. at 100). Nevertheless, whether the question presented is "essentially factual" or "essentially legal" still guides our inquiry. Id. at 1302-03. Where, as here, a district court's refusal to depart rests primarily on a legal conclusion, such as whether a factor is a permissible ground for departure, we engage in plenary review. See United States v. Whiteskunk, 162 F.3d 1244, 1249 (10th Cir. 1998).

11

### C.  Premeditation

The government first challenges the district court's conclusion that it could not depart upward on the grounds that the murder was premeditated.  It invokes a decision of this circuit holding that a sentencing court may consider charges that have been dismissed as part of a plea agreement in determining whether departure is warranted.  See United States v. Zamarripa, 905 F.2d 337, 342 (10th Cir. 1990) (noting that "misconduct not resulting in conviction may be factored into the district court's sentencing decision"); see also United States v. Cross, 121 F.3d 234, 241-44 (6th Cir. 1997) (holding that, under USSG § 1B1.4, "a district court may depart upwards based on conduct that is covered by a dismissed count"); United States v. Baird, 109 F.3d 856, 864 (3d Cir. 1997) ("conclud[ing] that a sentencing court, in its determination whether to depart from the sentencing range made applicable by the Sentencing Guidelines, may consider conduct underlying counts dismissed pursuant to a plea agreement");  United States v. Kim, 896 F.2d 678, 682-85 (2d Cir. 1990) (concluding that departures may be warranted for certain acts of misconduct not resulting in conviction).  The government also notes that the Supreme Court has held that a sentencing court may consider conduct of which the defendant has been acquitted.  See Aplt's Br. at 17 (discussing United States v. Watts, 519 U.S. 148 (1997)).  Here, the first-degree murder charge against Mr. Hanson was dismissed as part of the plea agreement. Therefore, the government contends, under Zamarripa and Watts the district court had the authority to depart upward on the grounds

that the murder was premeditated.

As the government concedes, this argument is inconsistent with our decision in United States v. Kelly, 1 F.3d at 1140-41. There, we concluded that the district court had erred in departing upward from the guideline range for second-degree murder on the grounds that the murder was premeditated. We reasoned that the question of premeditation had already been considered by the Guidelines in setting different offense levels for first-degree and second-degree murder:

> The presentence report followed by the district court recommended premeditation as a grounds for upward departure as it is not an element of the offense of conviction. Such an approach is overly simplistic. It is true the "sentencing court should 'treat each guideline as carrying out a "heartland," a set of typical cases embodying the conduct that each guideline describes'" and certainly, a premeditated murder is atypical of the heartland of cases representing second degree murders. Merely examining the elements of the offense of conviction, however, ignores the critical question of whether the Sentencing Commission adequately considered a potential aggravating circumstance in formulating base offense levels. If the sentencing court departs based on a circumstance already fully considered by the Sentencing Commission, it is an inappropriate grounds for departure. Premeditation was obviously considered in assigning the sentencing ranges applicable to first and second degree murder, as it is the only distinguishing factor between the two crimes, and thus accounts for a ten base offense level disparity. Consequently, the defendant's state of mind was adequately considered by the guidelines when assigning offense levels to the different statutory degrees of homicide. .

Id. at 1140-41 (emphasis added and citations omitted).

Nevertheless, the government maintains that the Supreme Court's decision in

Koon implicitly overruled Kelly.   Although Koon does not explicitly address the question of whether a sentencing court may upwardly depart from the Guideline range for a second-degree murder conviction on the basis of premeditation, it does contain a general description of the grounds justifying departure.  The government focuses on Koon's statement that, with the exception of prohibited departure factors, the Commission "'does not intend to limit the kinds of factors, whether or not mentioned anywhere else in the guidelines, that could constitute grounds for departure in an unusual case,'"  Koon, 518 U.S. at 92 (quoting 1995 USSG ch. 1, pt. A, intro. comment. 4(b)) (emphasis added).  According to the government, that statement means that, even though premeditation is addressed elsewhere in the Guidelines (i.e., in the provisions regarding first-degree murder), the sentencing court could still consider it in imposing a sentence for the second-degree murder committed by Mr. Hanson.

We are not persuaded by the government's argument that Koon implicitly overruled Kelly.  Although Koon sets forth a general framework for addressing departure decisions and clarifies the standard of review in this area, it does not address the situation that confronted us in Kelly and that presents itself here:  a request for departure based in actuality on the contention that the offense of conviction is more properly characterized as another, closely related offense.  Moreover, in stating that the Commission did not intend to limit the kinds of factors that the sentencing court should consider, whether or not mentioned anywhere else in the guidelines, the Supreme Court in Koon made no new law.

14

It simply quoted a statement from the Sentencing Commission's Guidelines Manual. That same statement was set forth in the version of the Manual that had been published at the time we issued Kelly. See 1992 USSG ch. 1, pt. A, intro. comment. 4(b).

In the absence of a superseding, contrary decision by the Supreme Court, we lack the authority to overrule the decision of another panel. See United States v. Hargus, 128 F.3d 1358, 1364 (10th. Cir. 1997) (stating that "[i]t is well established that one panel of this court may not overrule another.") We must therefore follow Kelly and reject the government's contention that the district court had the authority to depart upward from the second-degree murder guideline range on the grounds that the murder was premeditated.

However, we also note that there are sound reasons supporting the decision in Kelly. As we there observed, murder is defined by federal statute as "the unlawful killing of a human being with malice aforethought." 18 U.S.C. § 1111(a). First-degree murder is

> [e]very murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, escape, murder, kidnapping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, burglary, or robbery; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed . . . .

Id. In contrast, second degree murder is "[a]ny other murder." Id.

The Sentencing Guidelines track this distinction. Section 2A1.1 of the Guidelines

established a base offense level of 43 for first-degree murder. See USSG § 2A1.1 The

following section establishes a lower base offense level (33) for second-degree murder.

See USSG § 2A1.2. Mr. Hanson thus pleaded guilty to a murder that was not

premeditated, and, for such murders, the Guidelines provide a lower offense level.

To allow upward departure on the grounds that a second-degree murder was

premeditated would permit the sentencing court to treat the offense of conviction (here, a

murder that was not premeditated) as merely establishing a floor offense level. "[E]ach

sentencing court could depart upward based upon the 'real offense' [i.e., a premeditated

murder] whenever the court wished." Thomas W. Hutchison, David Yellen, Peter B.

Hoffman & Deborah Young, Federal Sentencing Law & Practice § 2A1.2 comment. (f)

(2000) (agreeing with the reasoning in Kelly and criticizing an opinion that adopted the

government's position, see United States v. Barber, 119 F.3d 276, 287-89 (4th Cir. 1997)

(Wilkins, J., concurring in the judgment)). Such a result would allow substantially

different sentences for the same crime, a result inconsistent with the a primary goal of the

Guidelines—reducing unwarranted sentencing disparity. See id.[3]

---

[3] We also do not agree with Judge Wilkins's suggestion that our decision in Kelly engaged in "speculation into the subjective thought processes that may have led to the development of various guidelines." Barber, 119 F.3d at 288 (Wilkins, J., concurring in the judgment)). Kelly merely considers the homicide provisions of the Guidelines as a whole. That analysis is consistent with Koon. See Koon, 518 U.S. at 96 (stating that, if a factor is not mentioned in the Guidelines, the court must consider the "structure and theory of relevant individual Guidelines and the Guidelines as a whole" and "decide whether the factor is sufficiently unusual to take the case out of the Guideline's heartland") (internal quotation marks omitted) (emphasis added); see also Hutchison et

16

The government's interpretation is also inconsistent with the principle that departures are designed to cover "rare occurrences" and "unusual case[s]." 2000 USSG ch. 1, pt. A, intro. comment. 4(b). Here, when questioned by the judge about the reasons for offering Mr. Hanson the opportunity to plead guilty to second-degree murder, the prosecutor explained that there were certain evidentiary difficulties in the government's case. See Aplt's App. at 199 (stating that, "where the defendant is obstructing justice and affirmatively misleading us, we are limited to what we can produce as evidence . . . [and] I want to advise the Court, and [the victim's] family now, that there were certain difficulties with this case that made it imperative in my judgment . . . that I would [offer] a plea for a second degree murder"). Such evidentiary difficulties, particularly with regard to an element such as premeditation that may be difficult to prove, are not the kind of "rare occurrences" contemplated by the Sentencing Commission as a justification for departure.

Accordingly, we hold that the district court properly concluded that it could not consider premeditation as a basis for upward departure.

---

al., supra, § 2A1.2 comment. (f) n.30 (stating that, because Kelly relies on the Guidelines Manual, it does not involve speculation as to the Commission's subjective thought processes and that "Judge Wilkins' opinion itself [by citing the Guidelines] indicates why no speculation is involved").

## D. Murder in Facilitation of a Robbery

The government makes a similar argument with regard to robbery. Here, it points to a Guideline provision that states:

> If the defendant committed the offense in order to facilitate or conceal the commission of another offense, the court may increase the sentence above the guideline range to reflect the actual seriousness of the defendant's conduct.

USSG § 5K2.9. The government maintains that, because the second-degree murder guideline says nothing about robbery, the sentencing court should be able to consider it in deciding whether to depart upward.

Although our decision in Kelly does not specifically address robbery as a departure factor, we conclude that its holding foreclosing consideration of premeditation also applies to robbery: both are part of the central distinction between the degrees of murder under the federal statute. See 18 U.S.C. § 1111(a) (defining first-degree murder to include "[e]very murder . . . committed in the perpetration of, or attempt to perpetrate, any . . . robbery"). Just as the Commission "implicitly accounted for the element of premeditation in assigning appropriate offense levels in accordance with the murder statute," Kelly, 1 F.3d at 1141, it implicitly accounted for the other distinctions between the two offenses, including the connection (or lack of it) between the murder and another felony. In light of Kelly, we therefore agree with the district court that it also lacked the authority to depart on the grounds that the murder was committed in order to facilitate a robbery.

18

E. Extreme Conduct

Finally, the government argues that the district court erred in concluding that it lacked the authority to depart on the grounds that Mr. Hanson engaged in extreme conduct. As noted above, the district court reasoned that it could not depart on this basis because Milford Hanson was no longer alive when the defendant committed the acts in question.

The government's request for an upward departure is based on USSG § 5K2.8, which provides:

> If the defendant's conduct was unusually heinous, cruel, brutal, or degrading to the victim, the court may increase the sentence above the guideline range to reflect the nature of the conduct. Examples of extreme conduct include torture of a victim, gratuitous infliction of injury, or prolonging of pain or humiliation.

As the government has observed, the Ninth Circuit has rejected the district court's interpretation of § 5K2.8. In United States v. Quintero, 21 F.3d 885 (9th Cir. 1994), after the defendant's two-year-old daughter had died, the defendant burned the body, removed the head with a shovel, and left it at a different location several miles away. At sentencing, the district court departed upward from the sentencing range, finding the defendant's conduct after the girl's death constituted extreme conduct under USSG § 5K2.8. On appeal, the defendant argued that § 5K2.8 applied only to live victims.

The Ninth Circuit affirmed the "extreme conduct" departure, holding that "[t]he section focuses on the defendant's conduct, not the characteristics of the victim." Id. at

19

894. The court reasoned that the term "victim" as used in § 5K2.8 modifies "degrading" and does not undermine the provision's general focus on the offender's conduct: "The phrase 'to the victim' appears to modify the term 'degrading,' making the point that the Sentencing Commission was not concerned about conduct that might be degrading to the offender. By contrast, the terms 'heinous,' 'cruel,' or 'brutal' conduct need no such clarification." Id. at 894 n. 8.

Although § 5K2.8 was not directly at issue, we discussed Quintero in United States v. Shumway, 112 F.3d 1413, 1424 (10th Cir. 1997). There, the defendant challenged the district court's conclusion that the prehistoric human skeletal remains from an archaeological site could constitute a "vulnerable victim" for purposes of USSG § 3A1.1.

We held that the skeletal remains could not constitute a vulnerable victim. However, in doing so, we contrasted the language of § 3A1.1 with § 5K2.8:

> However, unlike the "extreme conduct" provision, which focuses on the nature of the offender's conduct, the "vulnerable victim" enhancement focuses heavily on the characteristics of the crime's victim. This, we find, is a compelling distinction, for in provisions such as the USSG § 5K2.8 "extreme conduct" provision, the state of the victim, living or dead, is of far less consequence. As a result, our holding here is not intended to limit the application of provisions such as § 5K2.8, which focus on the offender's conduct. We leave for another day the question whether the "extreme conduct" provision, or like provisions, could properly apply to this case, or any case where the supposed "victim" is no longer among the living.

Id. at 1424.

The reasoning of Quintero and Shumway is supported by the language of §

20

5K2.8. The ordinary definitions of the relevant terms do not suggest that, in order to be "heinous", "cruel" or "brutal," a defendant's conduct must be consciously experienced by a murder victim. See VII Oxford English Dictionary 108 (2d ed. 1989) (defining "heinous" as "[h]ateful, odious; highly criminal or wicked; infamous, atrocious."); id. vol. IV, at 78 (defining "cruel" as "[d]isposed to inflict suffering; indifferent to or taking pleasure in another's pain or distress"); id. vol. II at 603 (defining "brutal" as "[i]nhuman, coarsely cruel, savage, fierce"). A defendant's "extreme conduct" may be hateful, odious, highly criminal, atrocious, savage or fierce (i.e., "heinous" or "brutal") even though the victim is already dead. See, e.g, Quintero, 21 F.3d at 888-89 (discussing the defendant's decapitation of the victim's body). Similarly, the defendant's conduct may involve the "inflict[ion] [of] suffering . . . pain or distress," not only on the victim but on the victim's family and friends and members of the community in which the crime is committed; it may thus be "cruel" in that sense.

Following the reasoning of Quintero and Shumway, we therefore hold that an upward departure under USSG § 5K2.8 may be imposed even though the victim is dead or unconscious when the defendant engages in the alleged conduct. In ruling that such departure was foreclosed, the district court interpreted USSG § 5K2.8 incorrectly. Accordingly, we will remand the case for consideration of whether departure is warranted

under this provision.[4]

## III. CONCLUSION

The fact that Mr. Hanson was convicted of second-degree murder rather than first-degree murder forecloses upward departure on the grounds that the murder was premeditated or facilitated a robbery. We therefore AFFIRM the district court's denial of the government's motion for an upward departure on those grounds. However, we further conclude that the district court erred in concluding that, under USSG § 5K2.8, the victim must be alive in order for the defendant's conduct to warrant depature. We therefore VACATE the district court's denial of the government's motion for upward departure based on USSG § 5K2.8. We REMAND the case to the district court for consideration of whether the facts warrant an upward departure under USSG § 5K2.8.

---

[4] This conclusion also finds support in our decision in United States v. Chanthadara, 230 F.3d 1237 (10th Cir. 2000). There, we concluded that the trial court did not err in instructing the jury in a capital case that the commission of the murder "in an especially heinous, cruel, or depraved manner . . . that . . . involved torture or serious physical abuse to the victim" was an aggravating factor under 18 U.S.C. § 3592(c)(6) and that the physical abuse could have been inflicted after death. Id. at 1261. Although Chanthadara involved a statutory provision rather that a Guideline, the two provisions contain similar language and serve similar aims—providing guidance to the factfinder regarding grounds for increased punishment.