**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 28, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

　　Plaintiff - Appellee,

v.

TROY LIVINGSTON,

　　Defendant - Appellant.

No. 21-2108
(D.C. No. 1:20-CR-00316-WJ-1)
(D. N.M.)

_____

**ORDER AND JUDGMENT***
_____

Before **McHUGH**, **BALDOCK**, and **MURPHY**, Circuit Judges.
_____

As early as December 2018, Troy Livingston began beating his girlfriend, Tyler Lamebear, who was the mother of his then-two-year-old son. The first two domestic violence incidents required Ms. Lamebear to seek emergency medical care. The second incident also involved Ms. Lamebear calling her family for assistance and Mr. Livingston assaulting the family members who came to render aid by bashing in the front windshield of their vehicle with a pipe wrench. The third incident

---

* After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Federal Rule of Appellate Procedure 32.1 and Tenth Circuit Rule 32.1.

of domestic violence can be called nothing short of cruel, depraved, and heinous. Mr. Livingston beat Ms. Lamebear for at least twenty minutes, punching her, kicking and stomping her, severing one of her fingers, and brutalizing her with a flashlight. Mr. Livingston did this with their son in the room. When Mr. Livingston was done beating Ms. Lamebear, he retired to bed, with their son on a mattress on the floor next to Ms. Lamebear as she wheezed in a pool of her own blood for over half an hour until police arrived after Mr. Livingston's mother, rather than Mr. Livingston, called 911. Although Ms. Lamebear was still clinging to life when police arrived, she did not survive the medevac flight to the hospital. Mr. Livingston pleaded guilty to second-degree murder.

Mr. Livingston's Presentence Investigation Report ("PSR") established a U.S. Sentencing Commission Guidelines range of 168 to 210 months. Although the district court denied the Government's motion for an upward departure, it varied upward to 240 months' imprisonment. In support of the variance, the district court focused on Mr. Livingston's escalating criminal activity, commission of the offense in front of Mr. Livingston's and Ms. Lamebear's son, and the "egregious," "brutal," and "extreme" nature of the offense. Mr. Livingston appeals, raising a single argument—his sentence is substantively unreasonable. We affirm the sentence because the reasons provided by the district court easily and incontestably support a sentence of at least 240 months.

## I.    BACKGROUND

### A.    *Factual History*

At least as early as December 2018, Mr. Livingston began physically abusing Ms. Lamebear. A more serious incident of domestic violence occurred in January 2019. In this incident, Mr. Livingston punched Ms. Lamebear in the face multiple times. Ms. Lamebear called family members for assistance. When family members arrived, Ms. Lamebear fled to their vehicle. Mr. Livingston pursued Ms. Lamebear out of a residence and toward the vehicle into which she entered, wielding a pipe wrench and smashing the front windshield of the vehicle. The domestic assault occurred in the presence of Mr. Livingston's and Ms. Lamebear's young child. This incident resulted in a charge of battery of a family member in tribal court.[1]

On April 6, 2019, domestic violence escalated to murder. Mr. Livingston and Ms. Lamebear returned to Mr. Livingston's mother's home around 3:00 a.m. following a night out. Shortly thereafter, Mr. Livingston and Ms. Lamebear began arguing, with Mr. Livingston accusing Ms. Lamebear of cheating on him.

---

[1] The two aforementioned incidents are the only documented incidents of domestic violence by Mr. Livingston against Ms. Lamebear. However, at sentencing, victim impact statements supported the conclusion that Ms. Lamebear endured additional violence at the hands of Mr. Livingston. *See* ROA Vol. III at 67, 69–70 (family member stating Ms. Lamebear "always had a getaway bag ready to go," had frequently stayed with relatives following incidents of physical abuse, and had temporarily moved to escape the domestic violence). Furthermore, Mr. Livingston's criminal activity extended beyond domestic violence, as he incurred seven charges stemming from an incident where he allegedly drove under the influence of drugs with his and Ms. Lamebear's child in the vehicle. This offense occurred shortly before the murder and Mr. Livingston was on release pending trial when the state dismissed the charges due to Mr. Livingston's federal incarceration.

Mr. Livingston's mother, Gertrude Livingston, heard crying coming from the bedroom and entered the room to find Mr. Livingston "on top of [Ms. Lamebear] with his fist raised." ROA Vol. II at 16–17. Gertrude told Mr. Livingston to stop beating Ms. Lamebear; but Mr. Livingston responded that it was none of her business and ordered her to leave the room. Gertrude complied with this request but called 911. Several minutes later, when the intensity of the thumping sounds increased, Gertrude reentered the bedroom and observed Ms. Lamebear "in a ball with her arms and hands around her head" and Mr. Livingston "stomping on [Ms. Lamebear] with his foot." *Id.* at 17. Gertrude again tried to encourage Mr. Livingston to cease the assault on Ms. Lamebear; this, however, provoked Mr. Livingston to remove Gertrude from her own home.

Mr. Livingston retrieved a flashlight and recommenced his attack on Ms. Lamebear. Outside, Gertrude heard the beating continue for ten to fifteen minutes, at which point sounds of the beating transitioned to a "wheezing" noise coming from the room. *Id.* Another half-hour passed before authorities arrived. During this time, Ms. Lamebear lay on the floor in a pool of her own blood struggling to breath and to maintain life. Meanwhile, Mr. Livingston retired to bed without calling for help or seemingly attempting to provide Ms. Lamebear any assistance.[2] *See* ROA Vol. II at 17 (authorities noted that when they arrived, "[n]o aid seemed to have been rendered by [Mr. Livingston] who was found asleep"). Pictures

---

[2] Nothing in the record suggests Mr. Livingston knew Gertrude had called 911.

4

taken at the scene depict blood splatter throughout the home, including on the walls and floor of the bedroom, on the door jamb to the hallway, in the hallway, and throughout the bathroom.

Upon entering the bedroom, authorities found Ms. Lamebear badly beaten and covered in blood, but still alive. Authorities also found Mr. Livingston's and Ms. Lamebear's son "next to [Ms. Lamebear] as he slept on a mattress placed on the floor." *Id.*; *see also id.* ("Upon arrival officers found the victim's infant child asleep on a mattress which was placed on the floor next to the victim's body."). Still clinging to life and consciousness, Ms. Lamebear, in what may have been her final words, told authorities that "Troy did this to me." *Id.* Although authorities medevac'd Ms. Lamebear, her heart stopped and she passed away before reaching the hospital.

A Death Investigation Summary stated the following regarding the injuries suffered by Ms. Lamebear:

> Autopsy examination revealed multiple bruises, scrapes and skin tears of the face and scalp. Many of the scrapes and skin tears had a distinctive, curvilinear shape and may have been caused by the same object. Broken bones of the nose could be felt beneath the skin. There were bruises and tissue tears of the insides of the lips. There was bleeding in the deep tissues of the scalp and bleeding over the surface of the brain (subarachnoid hemorrhage). The brain was swollen, a change that can occur when the organ is damaged and/or deprived of oxygen.
> There were scrapes and bruises of the chest, abdomen and back. Multiple ribs were broken; some of the broken ribs may have been caused by attempts at cardiopulmonary resuscitation (CPR), but several of them, particularly those of the back, were caused by the beating. There were tissue tears of the left lung associated with broken ribs and there was bleeding in the chest cavities.
> There were scrapes, bruises and skin tears of the arms and hands and bruises and scrapes of the knees. There was a patterned area of

5

bruising and scrapes of the left shoulder that could represent a bite mark.

Supp. App. at 63. On Ms. Lamebear's head alone, there were twenty-seven curvilinear abrasions and contusions, consistent with Mr. Livingston striking her with the flashlight, and another seven non-patterned abrasions and contusions, consistent with him striking her with his fist or foot. Some of the abrasions were several layers of tissue deep, with signs of bone present at the base of the abrasions. The autopsy also noted "a laceration with near avulsion of the distal left index finger."[3] *Id.* at 73.

### B.    *Procedural History*

A grand jury indicted Mr. Livingston on one count of first-degree murder, in violation of 18 U.S.C. §§ 1111, 1153.[4] Through a written agreement, Mr. Livingston pleaded guilty to a second-degree murder offense. The PSR established a Guidelines range of 168 to 210 months. The PSR discussed the possibility of an "Extreme Conduct" departure based on torture to the victim, gratuitous infliction of injury, and prolonging pain; but the probation officer recommended that "a sentence at mid-range of the guideline range appears to be sufficient." ROA Vol. II at 29.

---

[3] We spare the reader photographs of Ms. Lamebear's injuries taken during the autopsy but have reviewed them. The photographs highlight the effects of the brutal beating rendered by Mr. Livingston. Due to their graphic nature, we would entertain a motion to seal the photographs.

[4] Section 1111 of Title 18 of the United States Code is the statute governing murder. Meanwhile, 18 U.S.C. § 1153 permits for federal prosecution of certain crimes, including murder, if they are committed in Indian country.

The district court adopted the Guidelines range calculated in the PSR without objection from the Government or Mr. Livingston. The Government argued for a sentence of between 324 and 405 months based on either (1) a departure under United States Sentencing Commission, *Guidelines Manual*, §5K2.8 (Nov. 2018) given the length and brutality of the offense conduct or (2) a variance due to the offense conduct and the commission of the offense in the presence of Mr. Livingston's and Ms. Lamebear's son. Mr. Livingston presented testimony from Simone Viljoen, a forensic psychologist, in support of a lesser sentence, with her stating that (1) she was hopeful Mr. Livingston could rehabilitate because he showed self-motivation toward obtaining treatment; (2) the domestic violence incidents were partially attributable to "early exposure to violence in the home" when growing up and Mr. Livingston's "fear of abandonment."; (3) Mr. Livingston self-reported experiencing impulsivity, anger management, and substance abuse issues; (4) Mr. Livingston was experiencing PTSD, with him identifying "*his killing of [Ms. Lamebear]*" *as the* "*most impact[ful]*" *event* underlying the PTSD; (5) Mr. Livingston committed the offense while in a state of "emotional dysregulation"; and (6) Mr. Livingston was "deeply distressed and remorseful." ROA Vol. III at 125, 134, 138–41 (emphasis added). Mr. Livingston also argued his offense conduct was more closely related to voluntary manslaughter than second-degree murder and that his youthful age—eighteen at the time of the offense—mitigated his conduct.

The district court denied both motions to depart, concluding the case did not fall "out of the heartland of cases for second degree murder." *Id.* at 188. The district court then ruled on the motions for variances. The district court suggested Mr. Livingston's criminal history score underrepresented his criminal history because (1) one case was not scored, partially because it occurred in tribal court; (2) the second set of charges were dropped because of the murder charge, and (3) Mr. Livingston committed the present offense while on pretrial release, *see* USSG §4A1.3(a)(2)(D). The district court indicated it would have departed upward to a range of 188 to 235 months had the Government raised an argument under USSG §4A1.3. The district court then discussed Mr. Livingston's offense conduct, describing it as "egregious," "brutal," "extreme," "horrific," and "disturbing." *Id.* at 188, 189, 192–93. In full, the district court described Mr. Livingston's offense conduct and the murder scene as follows:

> [T]his was a brutal offense. In looking at the Government's exhibits, the various photos, [Ms. Lamebear] was beat almost to where she was unrecognizable. And [Mr. Livingston] admitted in his plea agreement that there were fists used, he kicked her, and then he used a flashlight. But she had extensive injuries all over her body.
>
> The record in this case also establishes that [Mr. Livingston's] mother twice tried to intervene to put a stop to this, and the first time he said something along the lines of, it's none of your business, and then the second time -- and this was sometime around the 911 call -- [Mr. Livingston's] mother was essentially locked out of the house. And then there's the tape of the 911 call. And so that, to me, was egregious.
>
> This horrific murder of [Ms. Lamebear] was done in the presence of [Mr. Livingston's] three-year-old son. Now, hopefully this little boy will not have memories of what happened, but the long and the short of it is, this little boy is going to grow up without his mother, and obviously he's also going to grow up without his father, because [Mr. Livingston] is going to be serving a lengthy term of incarceration.

And also, I was struck by the video cam of the officer who entered the bedroom, and there's [Ms. Lamebear] laying on the floor in a pool of her own blood dying. And there was blood all over the house, from those photos. So those photos and the fact that [Ms. Lamebear] was lying on the floor to me tends to negate any notion that [Mr. Livingston] tried to wipe off some of the blood. I mean, to me that's just inconsistent, leaving her there to die on the floor while [Mr. Livingston] is in the bed with the three-year-old son. And so these are aggravating factors.

And let me also say, there's some dispute about whether the beating was 20 minutes or 40 minutes. Whether it's 20 or 40, in my view, is really not that consequential. We know at a minimum it was 20 minutes, but it was horrific. And we do know from the presentation of the testimony of the case agent that the Navajo officers who initially responded said that at the time they responded, she was still living. So whether the beating was 20 minutes or 40 minutes, she suffered for a period of time laying on the floor in her own blood, and the record doesn't indicate that [Mr. Livingston] did anything to assist. And of course, that's the justification or the basis for the second degree murder plea in this case.

*Id.* at 191–93. For these reasons, the district opted to vary upward by 30 months, imposing a sentence of 240 months' imprisonment.

Mr. Livingston appeals his sentence. In his opening brief, Mr. Livingston raises a single issue—the district court imposed a substantively unreasonable sentence. *See* Appellant's Br. at 8–9 (disclaiming any procedural challenge to sentence).[5] To support his claim of error, Mr. Livingston first contends the district

---

[5] In his Reply Brief, Mr. Livingston attempts to recast his argument as one asserting that the district court failed to consider certain 18 U.S.C. § 3553(a) factors. Reply Br. at 3 ("Mr. Livingston is further asking this Court to acknowledge that the district court failed in its obligation to give careful consideration and analysis of all the evidence related to the sentencing factors listed in 18 U.S.C. § 3553(a)."). But a district court "failing to consider the § 3553(a) factors" is a "form[] of procedural error." *United States v. Smart*, 518 F.3d 800, 803 (10th Cir. 2008) (citing *Gall v. United States*, 552 U.S. 38, 51 (2007)). Accordingly, Mr. Livingston has waived this argument. *See United States v. Yelloweagle*, 643 F.3d 1275, 1280 (10th Cir. 2011); *Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007).

court placed too much weight on his prior domestic violence incidents and not enough weight on the abusive family in which he grew up. Second, Mr. Livingston focuses on the district court's conclusion that the case fell within the "heartland" of second-degree murder offenses, arguing that if such is correct, a variance based on his offense conduct was improper because the Guidelines range accounts for offense conduct falling within the heartland of an offense. Third, Mr. Livingston attempts to liken his offense conduct to voluntary manslaughter rather than second-degree murder.

## II.    DISCUSSION

We start by setting out the standard and framework for review. Then we apply that standard and reject Mr. Livingston's substantive reasonableness challenge.

### A.    *Standard & Framework for Review*

"[W]e review the substantive reasonableness of a sentence for abuse of discretion." *United States v. Sanchez-Leon*, 764 F.3d 1248, 1267 (10th Cir. 2014) (internal quotation marks omitted). We give "substantial deference to the district court's weighing of the[] [§ 3553(a)] factors." *United States v. Barnes*, 890 F.3d 910, 915 (10th Cir. 2018). This is because "[t]he sentencing judge is in a superior position to find facts and judge their import under § 3553(a) in the individual case." *Id.* (quoting *Gall v. United States*, 552 U.S. 38, 51 (2007)).

An abuse of discretion exists "only if the district court was arbitrary, capricious, whimsical, or manifestly unreasonable when it weighed the permissible § 3553(a) factors in light of the totality of the circumstances." *Sanchez-Leon*, 764

10

F.3d at 1267 (internal quotation marks omitted). In conducting abuse of discretion review, "[w]e do not reweigh the sentencing factors." *United States v. Blair*, 933 F.3d 1271, 1274 (10th Cir. 2019). As long as the selected sentence does not "exceed[] the bounds of permissible choice," we will affirm the sentence. *Barnes*, 890 F.3d at 915 (quotation marks omitted). "A sentence is more likely to be within the bounds of reasonable choice when the court has provided a cogent and reasonable explanation for it." *Id.* at 917.

"In reviewing a district court's decision to deviate from the Guidelines, we 'consider the extent of the deviation' but give 'due deference to the district court's decision that the § 3553(a) factors, on the whole, justify the extent of the variance.'" *United States v. Huckins*, 529 F.3d 1312, 1317 (10th Cir. 2008) (quoting *Gall*, 552 U.S. at 51). "[A] major [variance] should be supported by a more significant justification than a minor one." *Gall*, 552 U.S. at 50. However, "[a]lthough sentences imposed within the correctly calculated Guidelines range may be presumed reasonable on appeal, sentences imposed outside the Guidelines range may not be presumed unreasonable." *Huckins*, 529 F.3d at 1317.

### B. Analysis

Mr. Livingston advances three arguments for why his sentence is substantively unreasonable. To start, he contends the district court placed too much emphasis on his prior domestic violence incidents and the nature of the offense, while placing too little emphasis on Ms. Viljoen's mitigation testimony. But it is not the role of this court to reweigh the § 3553(a) factors. *Blair*, 933 F.3d at 1274; *see also United States*

*v. Miller*, 978 F.3d 746, 754 (10th Cir. 2020) ("[W]e do not reweigh the sentencing factors.").

To the extent our substantive reasonableness review encompasses review of whether the reasons provided by the district court demonstrate the district court selected a sentence within the permissible range of choices, the reasons stated by the district court aptly support a sentence of at least 240 months. Within the § 3553(a) factors, a district court shall consider the "history and characteristics of the defendant" and the need "to protect the public from further crimes of the defendant." 18 U.S.C. §§ 3553(a)(1), (a)(2)(C). As the district court recognized, although this was not the first time Mr. Livingston used force and violence against Ms. Lamebear, the PSR did not assign Mr. Livingston a single criminal history point, partially because the proceeding on the January 2019 incident occurred in a tribal court.[6] *See* USSG §4A1.2(i) ("Sentences resulting from tribal court convictions are not counted."). Thus, Mr. Livingston's criminal history score underrepresented his prior criminal conduct. And with a mere two criminal history points, the top end of his Guidelines range would have been 235 months. *See* USSG Ch. 5, Pt. A (Sentencing Table). Further, from December 2018 through the April 2019 murder of

---

[6] We acknowledge the PSR does not identify the disposition of the tribal court proceeding. But even if the January 2019 domestic violence incident did not result in a conviction, the district court was permitted to consider Mr. Livingston's conduct when assessing his history and characteristics, *see United States v. Yates*, 22 F.3d 981, 988 (10th Cir. 1994). Further, Mr. Livingston received no criminal history points from the seven charges stemming from driving under the influence of drugs because the state dismissed the charges given the federal murder prosecution.

Ms. Lamebear, Mr. Livingston engaged in an escalating pattern of violence, permitting an upward variance. *See United States v. Rollins*, 861 F. App'x 257, 262–63 (10th Cir. 2021) (unpublished) (no abuse of discretion in varying upward by 15 months based, in part, on escalating pattern of violence even where some incidents did not result in criminal charges); *United States v. Silas*, 787 F. App'x 525, 527–28 (10th Cir. 2019) (unpublished) (no abuse of discretion where district court varied upward based on pattern of escalating criminal behavior). Accordingly, these two § 3553(a) factors provide sufficient justification for the substantive reasonableness of the district court's upward variance to 240 months.

Other compelling reasons identified by the district court further support the substantive reasonableness of the total upward variance. The § 3553(a) factors direct a court to consider "the nature and circumstances of the offense" and the "seriousness of the offense." 18 U.S.C. §§ 3553(a)(1), (a)(2)(A). As relied on by the district court, several aspects of Mr. Livingston's offense and offense conduct warranted a variant sentence of at least 240 months. First, Mr. Livingston committed the offense in front of his and Ms. Lamebear's three-year-old child.[7]

Second, the murder was not the result of a transient lapse of judgment or the singular exertion of force beyond Mr. Livingston's intentions, but was the result of a

---

[7] This consideration goes to the nature of the offense but not the extremeness of the offense conduct. Thus, to the extent the district court concluded Mr. Livingston's offense conduct did not fall outside the heartland of second-degree murder, that finding did not encompass or account for Mr. Livingston committing the offense in the presence of his and Ms. Lamebear's three-year-old child. *See* USSG §5K2.8 (allowing for departure based on "extreme conduct" of the defendant).

prolonged and sustained attack on Ms. Lamebear. Strikingly, Mr. Livingston's mother twice urged Mr. Livingston to cease the beating. Mr. Livingston, however, responded by shooing his mother away the first time and removing her from her residence the second time. And rather than reflecting upon and moderating his conduct following either attempted intervention, Mr. Livingston intensified the degree and lethality of his force after both attempted interventions—going from punching Ms. Lamebear to kicking and stomping her after his mother's first attempt to intervene and then going from kicking and stomping Ms. Lamebear to repeatedly striking her with a flashlight. This fact supports the finding that Mr. Livingston demonstrated a heightened degree of indifference and depravity when committing the murder. And, if there was any doubt regarding the indifference and depravity demonstrated by Mr. Livingston, his decision, upon concluding the beating, to retire to and fall asleep in bed as Ms. Lamebear lay on the floor, wheezing in a pool of her own blood while struggling to maintain life, conclusively resolves the matter.

Third, as to the nature and circumstances of the offense, there can be little meaningful dispute that the district court accurately described Mr. Livingston's conduct as "brutal," "extreme," and "horrific." ROA Vol. III at 188, 189, 192, 193. The autopsy photographs and report depict all that is needed to support this conclusion by the district court, for Mr. Livingston, in the latter stage of his attack, struck Ms. Lamebear at least twenty-seven times in the head with a flashlight, often leaving gashing abrasions some of which cut down to Ms. Lamebear's skull. In conclusion, to the extent Mr. Livingston's history and characteristics did not, on their

14

own, justify a 30-month variance, the nature, circumstances, and seriousness of Mr. Livingston's offense and offense conduct, independent of and in combination with his history and characteristics, easily support the substantive reasonableness of the 30-month variance.[8]

This conclusion takes us to Mr. Livingston's next argument—where the district court concluded the offense conduct was within the "heartland" of second-degree murder, it could not rely upon the nature and circumstances of the offense to impose an above-Guidelines sentence. But, here, the argument does not provide any basis for relief.

First, the district court relied on considerations other than the nature and circumstances when imposing the variance. As already discussed, the district court cited Mr. Livingston's history and characteristics and that Mr. Livingston committed the offense in front of his and Ms. Lamebear's young child. These considerations sufficiently supported the substantive reasonableness of the upward variance.

Second, our case law holds that "[t]he nature of a defendant's brutal conduct in carrying out a murder [i]s an aggravating circumstance *not contemplated* by [USSG] §2A1.2 in setting an offense level for second degree murder." *United States v. Kelly*, 1 F.3d 1137, 1143 (10th Cir. 1993) (emphasis added). It was not arbitrary or unreasonable for the district court to conclude that Mr. Livingston's offense conduct

---

[8] Although Mr. Livingston faults the district court for not placing more weight on Ms. Viljoen's testimony, her testimony was not of such great weight to preclude the district court from focusing on other § 3553(a) factors.

qualified as brutal. *Cf. United States v. Hanson*, 264 F.3d 988, 998–99 (10th Cir. 2001) (in context of a Guidelines provision, defining "brutal" as "inhuman, coarsely cruel, savage, fierce" (quoting 2 Oxford English Dictionary 603 (2d ed. 1989))). As already discussed, on its face, Mr. Livingston sought to inflict suffering through the prolonged and escalating nature of his attack, particularly where Ms. Lamebear was defenselessly curled up in a ball for much of the attack. Mr. Livingston also acted with a heightened degree of indifference to Ms. Lamebear's suffering, both by repeatedly striking Ms. Lamebear with the flashlight and by retiring to bed and going to sleep without rendering aid or seeking help, all while Ms. Lamebear laid on the floor wheezing to death in a pool of her own blood. *See United States v. Brave Bull*, 828 F.3d 735, 738 (8th Cir. 2016) (concluding departure under USSG §5K2.8 appropriate where defendant pushed victim down basement stairs, checked on victim's status, and left victim there to die without seeking help). Accordingly, the district court's statement that the case did not fall outside the "heartland" of second-degree murder did not preclude the district court from varying upward in this case.

Lastly, Mr. Livingston argues his case is more akin to voluntary manslaughter than second-degree murder and this should have prompted the district court to vary downward from the Guidelines range. We disagree and conclude that Mr. Livingston's offense conduct clearly falls within the second-degree murder statute. The elements for second-degree murder are (1) "the defendant caused the death of the victim named in the indictment"; (2) "the defendant killed the victim with malice aforethought"; and (3) "the killing took place within the . . . jurisdiction

16

of the United States." Tenth Cir. Cri. Pattern Jury Instruction 2.53: Murder in the Second Degree (2021). The jury instruction goes on to define "malice aforethought" as acting "with callous and wanton disregard for human life." *Id.* Put another way, malice aforethought may be shown based on "a gross deviation from a reasonable standard of care, of such a nature that a jury is warranted in inferring that the defendant was aware of a serious risk of death or serious bodily harm." *United States v. Soundingsides*, 820 F.2d 1232, 1237 (10th Cir. 1987). Finally, the jury instruction states that a jury "may consider the use of a weapon or instrument, and the manner in which death was caused." Tenth Cir. Cri. Pattern Jury Instruction 2.53.

Given the prolonged nature of the beating, Mr. Livingston persisting in and intensifying the attack after his mother twice attempted to intervene, and Mr. Livingston's use of the flashlight, one can easily conclude Mr. Livingston acted with malice aforethought, grossly deviated from a reasonable standard of care, and was aware of a serious risk of serious bodily injury. Accordingly, the district court correctly rejected Mr. Livingston's contention that his conduct was more akin to voluntary manslaughter than second-degree murder.

In summation, we do not reweigh the § 3553(a) factors considered by the district court. Further, the reasons offered by the district court for a 30-month upward variance—Mr. Livingston's unscored criminal history, commission of the offense in front of his and Ms. Lamebear's young child, and the "brutal," "extreme," and "horrific" nature of the offense—more than adequately support the substantive reasonableness of the variance and accompanying 240-month sentence.

17

## III.    CONCLUSION

AFFIRMED.

Entered for the Court


Carolyn B. McHugh
Circuit Judge